**W. J. USERY, Jr., Secretary of Labor, Petitioner,**

v.

**HERMITAGE CONCRETE PIPE COMPANY and Occupational Safety and Health Review Commission, Respondents.**

**No. 76–1316.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1978.

Decided Aug. 31, 1978.

---

Dennis K. Kade, Michael H. Levin, Allen H. Feldman, U. S. Dept. of Labor, Washington, D. C., for petitioner.

Gen. Counsel, O. S. H. R. C., Washington, D. C., R. Robert Kassem, Kassem, Cain & Monlier, Knoxville, Tenn., Government Appeal, for respondents.

Allen H. Sachsel, Appellate Sect., Civil Div., Dept. of Justice, Washington, D. C., for respondent OSHRC.

Before WEICK, EDWARDS and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

The Secretary of Labor petitions for review of an order of the Occupational Safety and Health Review Commission which declined to enforce a citation issued by the Secretary to the Hermitage Concrete Pipe Company for a serious violation of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 *et seq.* We hold that the Commission employed an improper standard in determining whether a given violation of the Act is "serious" as that term is defined in Section 17(k) of the Act, 29 U.S.C. § 666(j), and accordingly remand the case to the Commission.

The respondent Hermitage Concrete Pipe Company engages in the manufacture of cement piping and conduits at its plant in Knoxville, Tennessee. Involved in this petition are two aspects of the manufacturing process: the "batching" phase of manufacture involving the mixture of the necessary ingredients for the piping and conduits, and the "finishing" phase, consisting primarily of chipping, grinding and blowing with compressed air to remove certain silica-based imperfections from the castings.

During a routine inspection on June 13 and 14, 1973, OSHA Industrial Hygienist Donald Roberts took preliminary dust samples in an effort to determine whether the operations in question were exposing the employees of Hermitage to impermissible levels of free silica. Roberts thereafter returned to Hermitage on August 1, 1973 with approved air sampling equipment and obtained a series of respirable dust samples for certain employees in the conduit batching and finishing areas, none of whom was observed wearing a respirator while working. Analysis of the samples so obtained revealed that in the finishing operation, and to a slight degree in the batching operation, dust exposure exceeded those limits specified in 29 C.F.R. § 1910.93(c), now recodified at 29 C.F.R. § 1910.1000(c). Shortly thereafter a citation was issued against Hermitage charging, among other things,[1] that it had been guilty of a serious violation of the Act in failing to protect its employees from silica exposure. The citation imposed a penalty of $650 and ordered abatement of the condition. The company contested the citation.

In proceedings before an Administrative Law Judge of the Commission, dust contamination revealed by the samples was found to exceed the level permitted by OSHA regulation.[2] Nevertheless, he ruled that the Secretary had failed to prove a serious violation because, he found, the company neither knew, nor with the exercise of due diligence could have known, that the silica content of the air "created a condition likely to cause death or serious physical harm." *See* 29 U.S.C. § 666(j). The Secretary of Labor subsequently sought review before the Commission of the decision of the Administrative Law Judge. The Commission agreed that the conditions at the Hermitage plant violated OSHA regulations. Without addressing the "due diligence" ruling of the Administrative Law

---

1. Hermitage was also found to have committed nonserious violations of 29 C.F.R. § 1910.95, which regulates excessive noise. These violations are not before us on this petition.

2. Roberts' testimony established that under 29 C.F.R. § 1910.1000(c) and Table Z–3 [Mineral Dust], the applicable limit of exposure in milligrams per cubic meter on an 8-hour time-weighted average was .83 in the finishing operation and 2.04 in the batching operation. The Commission found that six employees had been exposed to excessive dust, and the Administrative Law Judge specifically found employee exposure up to 6.25 milligrams per cubic meter on a weighted average in the finishing operation and 2.14 in the batching operation.

Hermitage did not contest the Secretary's sampling data nor the exposure limits, which Roberts testified to have calculated according to the regulatory formula.

Judge, a majority of the Commission concluded that in any event, the Secretary's proofs were insufficient to establish that the air posed a sufficiently grave threat to the employees' health:

On review, Respondent does not contest Judge Larkins' findings that its employees were exposed to excessive silica dust. Accordingly, Respondent violated 29 C.F.R. 1910.93(c) [presently codified at 29 C.F.R. § 1910.1000(c)]. The question that remains is whether the violation was serious. On this question Complainant has the burden of establishing that the levels of silica dust in Respondent's workplace would result in serious physical harm or death.

Continuing, Chairman Barnako observed for a majority of the Commission:

Complainant relies primarily on certain scientific articles and treatises which deal generally with the subject of silica dust. They show that excessive exposure to large concentrations of silica dust can produce serious physical harm, but whether serious harm does result depends on the duration of exposure, among other things. The documents do not show the specific durations that produce serious harm when the exposure is to particular levels of silica dust. Thus we cannot determine from the publications, or for that matter, from any other record evidence, how long a person can be exposed to a certain quantity of silica dust before serious bodily harm would result. Accordingly, it is impossible to determine if Respondent's employees would be seriously harmed by the silica dust levels found in Respondent's workplace. Moreover, even if we knew the specific time spans, there is no evidence that shows how long Respondent's employees were exposed to the dust levels.

The publications also show that the extent of physical harm depends on the size, form and type of silica dust, that is, on the percentage of the dust that is respirable fine crystalline quartz. Nonetheless, there is no evidence showing what percentage of the silica dust in Respondent's workplace was respirable fine crystalline quartz.

Additionally, Complainant did not show that Respondent's employees have already suffered severe bodily harm, or that they are showing symptoms of any type of physical impairment that later leads to serious harm. In fact, aside from the publications, Complainant's only evidence on the question of serious harm was the opinion of the compliance officer that Respondent's employees were exposed to dangerous levels of silica dust. In view of the scientific publications which show that the duration of exposure and the kind of dust, as well as the levels, determine whether serious bodily harm can result, we find the compliance officer's opinion insufficient to support a finding of a serious violation. Accordingly, we must affirm the violation as nonserious. (Footnote omitted.)

■ The Commission was, however, in disagreement over the sufficiency of the Secretary's proof. In particular, Commissioner Cleary, while concurring with the propriety of the fine which the Commission imposed as a penalty for the violation, dissented from the majority's evaluation of the evidence:

Respondent did not dispute the fact that excessive exposure to silica dust can be injurious to health. Indeed, at the hearing respondent asked Judge Larkin to take official notice that "silica dust is serious and dangerous to one's health." Also the concentration of silica dust exceeded the permissible 8-hour time weighted average limits of the standards. The limits of the standards are those initially adopted under the Walsh-Healey Act to regulate conditions "hazardous or dangerous to the health and safety of employees engaged in the performance of" government supply contracts. 29 CFR § 1910.99 (36 F.R. 10523, May 29, 1971); 41 CFR 50–204.1. Further, scientific articles and treatises offered by the Secretary of Labor in this case clearly establish that death or serious physical harm can result if a person contracts a silica related disease.

From the foregoing I would hold that the Secretary of Labor has carried his burden of proof (1) that there was a danger of a silica related disease because of the nature and extent of exposure to employees to silica dust; and (2) that if a silica-related disease were contracted there was a danger of physical serious harm or death. (Citations omitted.)

At the outset the parties disagree in their basic analysis of the dispute with the Commission's order. The Secretary urges that the Commission applied an erroneous test in judging whether the company's violation was serious within the meaning of the Act. The Commission and Hermitage, on the other hand, urge that the Commission's decision is insulated on review by the "substantial evidence" test of 29 U.S.C. § 660(a):

> The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

In short, the parties are in disagreement over whether in our review we are faced with a factual issue, calling for application of the substantial evidence test, or a legal issue centering on the Commission's interpretation of Section 666(j)'s definition of a serious violation. We conclude that this petition clearly presents a question of statutory interpretation and that the substantial evidence test is inapposite. *See Brennan v. OSHRC (Gerosa, Inc.)*, 491 F.2d 1340, 1343–44 (2d Cir. 1974).

■ Section 666(j) provides:

> For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

We agree that the Commission employed a more restrictive standard for a serious violation than that which is called for by the Act. The Commission appears to have ignored the standard that there be "a substantial probability that death or serious physical harm *could* result from a condition which exists." Instead, a majority of the Commission, by consistent employment of the term "would" in place of "could," appears rather clearly to have required a greater degree of certainty. The distinction is not merely one of semantics.

The Secretary expresses a preference for the rule followed by the Ninth Circuit in *California Stevedore & Ballast Co. v. OSHRC*, 517 F.2d 986, 987–88 (9th Cir. 1975). There an OSHA inspector issued a citation for a serious violation where it appeared that employees of the respondent stevedoring company had left a hatch beam in place and unsecured while unloading through the hatch. The evidence indicated that while it was not likely that the beam would become dislodged, there was a substantial probability that death or serious injury would have resulted if the beam had in fact become dislodged. The Ninth Circuit held that this showing was sufficient to uphold the determination that the violation was serious under Section 666(j). While concluding that the section was "artlessly and ambiguously drafted," *id.* at 988, the Ninth Circuit rejected the company's claim that the probability requirement of the statute related both to the likelihood of an accident as well as the degree of harm the accident might cause. The court reasoned:

> Congress declared its purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." OSHA § 2(b), 29 U.S.C. § 651(b). Congress clearly intended to require employers to eliminate all foreseeable and preventable hazards. *National Realty & Construction Co. v. OSHRC*, 160 U.S.App. D.C. 133, 489 F.2d 1257, 1265–67 (1973). The original Senate bill treated all violations as "serious." As finally enacted, however, OSHA incorporated a House proposal to leave discretionary penalties for violations "determined not to be of a serious nature." Conf.Rep. No. 91–1765,

1970 U.S.Code Cong. & Admin.News, p. 5237. Congress apparently decided that violation of some regulations might pose so little threat of harm that a penalty should not be mandatory. Where violation of a regulation renders an accident resulting in death or serious injury possible, however, even if not probable, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation. When human life or limb is at stake, any violation of a regulation is "serious."

517 F.2d at 988. *See id.* at 988 n. 1. The Fifth Circuit appears to be in substantial agreement with the Ninth Circuit's interpretation in *California Stevedore, supra. See Shaw Construction, Inc. v. OSHRC,* 534 F.2d 1183, 1185 & n. 4 (5th Cir. 1976).

■ Where, as here, the Secretary of Labor and the Commission differ over the construction of the Act, we have indicated that the Commission's ruling is entitled to great deference. *Dunlop v. Rockwell International,* 540 F.2d 1283, 1289–90 (6th Cir. 1976). At the same time, what little authority there is in our circuit is at odds with the Commission's view and supports the view shared by the Secretary and the Ninth Circuit in *California Stevedore.* In *Brennan v. Winters Battery Manufacturing Co.,* 531 F.2d 317, 324 (6th Cir. 1975), *cert. denied,* 425 U.S. 991, 96 S.Ct. 2202, 48 L.Ed.2d 815 (1976), we indicated:

A violation is "serious" if there is a possibility of an accident and a substantial probability that death or serious physical injury would result.

*Id.* at 324, *quoting with approval Brennan v. OSHRC (Interstate Glass),* 487 F.2d 438, 439 (8th Cir. 1973). *Cf. Empire-Detroit Steel Division v. OSHRC,* 579 F.2d 378, 383–84 (6th Cir. 1978); *National Realty & Construction Co. v. OSHRC,* 160 U.S.App.D.C. 133, 489 F.2d 1257, 1265 & n. 33 (1973)

[discussing the degree of probability required for a violation of the "general duty" clause, 29 U.S.C. § 654(a)(1)].

We agree that the Commission imposed too stringent a degree of probability in resolving that the Secretary failed to prove a serious violation. Like the Fifth Circuit, we accept the standard enunciated by the Ninth Circuit in *California Stevedore.*

Our alignment with the foregoing authorities does not, however, end the matter and require remand for entry of an order finding a serious violation, as seems to be contended by the Secretary. In this respect, we conceive that the Secretary's argument goes well beyond any disagreement with the standard imposed and instead disagrees with the quantum of proof which the Commission concluded was necessary to establish the violation as "serious."

■ Although variously stated, the Secretary's position seems to be that the proof unquestionably showed Hermitage's employees were exposed to silica dust; that silicosis and pneumoconiosis can result from exposure to silica dust; that, therefore, upon a showing that the exposure to dust exceeded the permissible amounts under the limitations, the Secretary's citation for a serious violation must invariably be upheld. While we believe that the Commission was, as a matter of law, unduly restrictive in requiring the Secretary to show that silicosis, and hence serious bodily injury or death, "would" result from the condition, we are unable to agree that the evidence of the conditions at Hermitage left no discretion in the Commission to determine whether the violation was serious or nonserious. In this regard, we believe that the issues were substantially factual and that it was within the expertise of the Commission to judge the adequacy of the proof before it. So long as there is substantial evidence to support its findings in this regard, those findings will not be disturbed upon review.[3]

---

**3.** The principal factual difference between the Secretary and the Commission is in whether the Secretary's proof established that the exposure of the employees to the dust was "chron-

ic." While the Secretary makes such a claim, the Commission declined to make a finding of chronic exposure, expressly concluding that there was insufficient evidence regarding "how

Viewed in this light then, the issue is not, as contended by the Secretary, whether silica dust, in the abstract, could result in silicosis, which was admitted, but rather whether the degree of exposure at the Hermitage plant, as shown by the proofs, could (or might) result in silicosis, an issue in hot dispute. As shown by the quoted excerpts from the Commission's opinion, a majority was not satisfied with the sufficiency of the Secretary's evidence.

The violation was established solely by the testimony of Mr. Roberts, by proof of

> long [Hermitage's] employees were exposed to the dust levels"—an issue primarily of quantum of proof.

It is apparent that each party tends to over-read the position of the other in their briefs before us. Thus, the Commission's brief notes:

> The Secretary's contentions rest upon an erroneous assumption and a misreading of the requirements of section 17(k) of the Act, as well as a misunderstanding of the Commission's decision. The Secretary erroneously assumes that a violation of any health standard necessarily must be serious. But, there is no requirement in the Act which limits the Secretary's authority to promulgate health standards only to those conditions which present a substantial probability of death or serious physical harm. On the contrary, the Secretary may promulgate, and has promulgated, health standards applicable to situations in which death or serious physical harm clearly is not a substantial probability. See e. g., 29 C.F.R. 1910.95 (violations cited in this very case as "nonserious") [see note 1 supra]; 29 C.F.R. 1910.132(a) (see Secretary v. Imco, Occ. S. & H. Dec. (CCH), para. 16,404 (1974), in which citation was for nonserious violation). In sum, neither the existence of the health standard, nor the fact that violation of that standard under certain circumstances may produce serious physical harm is sufficient to meet the Secretary's burden in a particular case. (Emphasis in original.)

In reply, the Secretary urges that the Commission has overstated his position:

> The Commission further contends . . . that the Secretary's interpretation would make any health violation "serious" without regard to the requirements of section 17(k). The short answer is that this contention is inapposite where, as here, the record contains unrebutted evidence of chronic worker exposure to excessive silica levels; unrebutted expert testimony that such exposure could engender silicosis; and a company admission that if silicosis were contracted it would be seriously harmful. Thus this Court is not required to reach the specious issue of

the samples, and by the presentation of certain scientific articles and treatises dealing generally with the subject of silica dust and the nature and cause of silicosis and pneumoconiosis.[4] In particular the Commission was dissatisfied with the quantum of proof which the Secretary presented to it concerning the exact conditions. Thus, they complain that while excessive levels of dust on at least one occasion were shown, the frequency of the occurrence and the frequency of exposure to individual employees were not established. Nor was there any particular showing of particular time

> whether all health violations are "serious" per se. It need only decide that the Secretary proved this violation "serious" under section 17(k) as properly construed, since he specifically showed there was "a possibility of an [injurious development] and a substantial probability that death or serious physical injury would result" if that development occurred. Brennan v. Winters Battery Mfg. Co., supra, [531 F.2d at 324].
>
> More importantly, the Commission's contention misconceives our argument. We do not assert that all health violations are "serious" per se, since even if the symptoms caused by excessive exposure to many of the substances regulated by OSHA are contracted, they would not represent "serious physical harm." Nor do we assert that a simple showing that prescribed levels for a particular substance have been exceeded makes out a serious health violation. We simply contend that where, as here, the Secretary elicits unrebutted evidence of chronic exposure to silica dust exceeding permissible levels; regular excursions to six times those levels; expert testimony that such exposures could cause silicosis; and admissions that silicosis is a seriously harmful disease, he has established both the "possibility" of harm, and the "substantial probability" of serious effects should harm ensue, which are required by section 17(k). As we noted in our opening brief . . . that interpretation does not "ignore" the Act's "substantial probability" language. . . . It simply applies it in accord with the courts' repeated interpretations. (Footnotes omitted.)

4. The Administrative Law Judge had refused to consider such treatises, considering them to be inadmissible hearsay. A majority of the Commission on review declined to rule on whether the ALJ had erred in excluding them but held that in any event, the treatises did not suffice to make up for the absence of proof of the particular conditions existing at the Hermitage plant.

spans over which respondent's employees were exposed to the dust levels in question. Further, the Commission observed that:

> The publications also show that the extent of physical harm depends upon the size, form, and type of silica dust, that is, on the percentage of the dust that is respirable fine crystalline quartz. Nevertheless, there is no showing what percentage of the silica dust in Respondent's workplace was respirable fine crystalline quartz.

■ Under like circumstances, applying what we here hold to be the correct rule, another body might reach a different conclusion concerning the adequacy of the Secretary's proofs, and indeed, the Commission itself might, on remand, conclude that there was sufficient evidence under the less restrictive standard which we have here held the statute imposes. Nevertheless, this particular type of inquiry, i. e., whether the Secretary's proof is adequate to meet the burden placed upon him, must necessarily rest, we think, in the good discretion of the Commission as the trier of facts and must necessarily vary with the facts of each case and indeed with the capabilities and range of proof in each case.[5] Here, without indicating our own view, we note that the Secretary could have presented more complete proof from which the exact nature of the operation, its duration, the exposure of employees, the composition of the dust, and the other circumstances existing at the Hermitage plant could be more adequately de-

termined. Thus we hold that this particular burden is a classic application of the role of the Commission in evaluating the proof before it, a role which Congress has entrusted to the Commission, see *Rockwell International, supra,* 540 F.2d at 1289–90, and into which we must not intrude unless indeed there is no substantial evidence to support the Commission's negative findings.

In summary, we hold that the legal standard for establishing a serious violation under the Act is that expressly set forth in the language of the statute and particularly its requirement that the Secretary show substantial probability that death or serious physical harm "could" rather than "would" result from the condition which has been shown actually to exist in the place of employment.

On the other hand, we also hold that the quantum of proof which the Commission, as an independent body appointed by the President, may deem necessary to satisfy it of the existence of the "condition" within the meaning of the statute is a matter on which its experience and expertise is entitled to great deference. We do not address the question of whether the Secretary might, by regulation, establish a level of dust which constitutes *per se* a "serious" violation of the Act. The fact is he has not done so. Absent this issue, we believe that the fundamental responsibility for determining the seriousness of the violation, under a proper standard of law, rests in the Commission.

---

5. In the Commission's view, at least, its holding is not inconsistent with *California Stevedore,* and we agree that it need not be. The difficulty understandably arises from applying a uniform standard to a wide variety of industrial conditions, each of which has its own unique hazards and history. By way of analogy, therefore, it can be observed that *California Stevedore* was concerned not simply with the theoretical possibility that any beam might fall, but that the hatch beam in question might fall. In this regard, the possibility of injury—the risk—had to be measured by the specific conditions existing at that location, e. g., where the beam was located, how far it might fall, its weight, and the like. In other words, the issue for the Commission was

(a) whether the hatch beam in question might fall;

(b) whether if it did, it might under the specific conditions found at the location, cause injury; and

(c) whether, if injury occurred, there was "a substantial probability" that the result would be serious physical harm or death. Similarly, the issue for the Commission here was

(a) whether employees were exposed to excessive dust;

(b) whether the conditions actually found to exist at the location might cause silicosis or pneumoconiosis; and finally,

(c) if they might, whether there was "a substantial probability" that the result would be serious physical harm or death.

The case is remanded to the Commission for further proceedings consistent with this opinion.