[No. 26162-6-II. Division Two. December 14, 2001.]

Lee Cook Trucking and Logging, *Respondent*, v. The Department of Labor and Industries, *Appellant*.

---

*Christine O. Gregoire, Attorney General*, and *Bourtai B. Hargrove, Assistant*, for appellant.

*Paul D. Doumit* (of *Doumit & Doumit, P.C.*), for respondent.

QUINN-BRINTNALL, J. — The Department of Labor and Industries Industrial Safety and Health Division (L&I) appeals the superior court reversal of a Board of Industrial Insurance Appeals (Board) ruling on one of several safety violations charged against Lee Cook Trucking & Logging. L&I claims that the trial court erred in holding that the offense was not a "serious" violation. Holding that the superior court misinterpreted the meaning of "serious" violation, we reverse the superior court, and reinstate the decision of the Board.

## FACTS

L&I inspector Monte Hanks visited Lee Cook's logging site in Cougar, Washington, at least once in late 1997 and again in early 1998. Hanks cited Lee Cook for three safety requirements in logging operations. The citations focused on broken wires in the cable used to haul logs and to

stabilize a tower in violation of former WAC 296-54-543 (1979).[1]

The violation at issue here referenced former WAC 296--54-543(7)(b) and read as follows:

> Left rear quarter—crushed section with more tha[n] two broken wires in one lay approximately 8 feet off drum; . . .

Board Record at 16 (Item[2] 1-1, Instance 1).

There were seven subsections under § (7)(b). The citation alleged a violation of subsection (v) of § 7(b), which read as follows:

> (b) Wire rope shall be removed from service when any of the following conditions exist:
>
> . . . .
>
> (v) In standing ropes, more than two broken wires in one lay in sections beyond end connections or more than one broken wire at an end connection.

Former WAC 296-54-543(7)(b)(v) (1979).

Cable is made up of strands of wire wrapped around a core wire. Logging cable is usually referred to as 6x29 or 6x19, which means six interwoven strands made up of 19 or 29 individual wires. The "lay" referenced in former WAC 296-54-543(7)(b) is a unit made up of one complete spiral or helix of a strand in the cable. A lay is determined by looking at the strand at the top of the cable, through where the strand wraps down around the core of the cable, is interwoven with the other strands, and comes back up to the top, where a new lay begins.[3]

---

[1] WAC 296-54-543 was amended extensively in 1999.

[2] WISHA citations are called "Items."

[3] Thomas Ford (Logging and Forest Products Safety Specialist) explained the structure of cable at the Board hearing as follows:

> A strand of cable—usually a logging cable is made up of 6x29 or 6x19. What this is is you've got 6 strands made up of 19 or 29 individual wires. A strand, which is made up of the individual wires, one lay and one strand is where that line starts, it makes one complete wrap around the cable and comes back to the starting point as it progresses down the line.

Transcript (Apr. 1, 1999, 8:10) at 19.

THE LOGGING OPERATION AND CABLE

The particular logging method Lee Cook used at the time of the violations was "tree-length logging." This operation uses a powerful block and tackle system that allows the loggers to pull trees up to the landing site without first having to cut them into more manageable pieces. They then can be loaded onto trucks. A machine called a yarder operates the pulleys and cables, which are attached to the tower. The tower is stabilized by guy lines made of wire cable or ropes. The wires of these guy line cables are the ones at issue.

As noted above, cables used as "standing ropes" (e.g., guy lines) could not have more than two broken wires in one lay in sections beyond end connections or more than one broken wire at an end connection. Former WAC 296-54-543 (7)(b)(v). L&I witness Thomas Ford explained why the regulations were more stringent for standing lines:

> Any time you have a standing line it's a more critical part of the stabilization, like as a guy line. You don't get the normal wear from the line moving back and forth as you would with a running line. So any time you have a standing line that starts to show any type of deterioration—if it's visible to where you can see then there is normally some type of deterioration that's taken place within the line around the core where it is not visible.

Transcript (Apr. 1, 1999, 8:10) at 27.

PROCEDURAL HISTORY

After the two inspections in question (in late 1997 and early 1998), Hanks issued several citations. Hanks classified the citation at issue here as a "serious violation" under RCW 49.17.180(6). Under the internal reassumption of jurisdiction process (see RCW 49.17.140(3)), the agency reconsidered the citations and issued a Corrective Notice of Redetermination on April 22, 1998. The Corrective Notice corrected an initial mistake in determining the company's size, and reduced the fine amount on the citation at issue by half (from $680 to $340). Various citations were affirmed, vacated, and overturned during the appeals process

through the agency and the courts. Only one, Item 1-1, Instance 1, is at issue in this appeal.[4]

Lee Cook appealed the citations to the Board, and the Board judge issued a proposed decision and order on June 30, 1999. In this decision, he affirmed both the citation and the determination that it was a "serious" violation. The Board subsequently denied Lee Cook's petition for review.

Lee Cook appealed the Board's decision to Thurston County Superior Court. That court affirmed the violation of former WAC 296-54-543(7)(b) itself, but reversed its characterization as "serious" under RCW 49.17.180(6). L&I appeals this reversal, and Lee Cook counter-appeals, claiming lack of subject matter jurisdiction.

ANALYSIS

■ The main issue on appeal is the construction of the term "serious violation" under RCW 49.17.180. Our review is de novo. *Stuckey v. Dep't of Labor & Indus.*, 129 Wn.2d 289, 295, 916 P.2d 399 (1996).

STATUTORY CONSTRUCTION OF RCW 49.17.180(6)

Under the Washington Industrial Safety and Health Act of 1973 and the Washington Administrative Code, violations assessed against employers are classified as either "willful," "serious," or not "of a serious nature." RCW 49.17.180. The sole issue L&I raises is the proper interpretation of the language describing a "serious" violation under RCW 49.17.180(6), which reads in pertinent part as follows:

> For the purposes of this section, a serious violation shall be deemed to exist in a work place if there is a *substantial probability that death or serious physical harm could result* from a condition which exists . . . in such work place . . . .

(Emphasis added.)

---

[4] Three violations of former WAC 296-54-543(7)(b) were grouped under Item 1-1. According to L&I, violations are "grouped" when there is more than one example of a violation but only one penalty is sought for all violations noted under one item. Hanks did not note which subsections of section (7)(b) Lee Cook violated, but he did describe the nature of each violation.

AMBIGUOUS ON ITS FACE

The parties offer two interpretations of the italicized language above. L&I asserts that the "substantial probability" language refers to the likelihood that, should *any* harm result from the violation, that harm will be death or serious physical harm. Lee Cook counters that the term "substantial probability" modifies the risk of harm itself and asserts that there must be proof of a substantial probability that harm *will* result from the violation.[5] We agree with L&I.

█ We accord an agency's legal interpretation substantial weight if it falls within the agency's expertise in a special area of law. *Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987 (1994). The Ninth Circuit held that the nearly identical language in the federal counterpart to RCW 49.17.180(6) is ambiguous in *California Stevedore & Ballast Co. v. Occupational Safety & Health Review Commission*, 517 F.2d 986, 988 (9th Cir. 1975). We agree that the statutory language is ambiguous and requires interpretation.

INTERPRETATION OF THE FEDERAL COUNTERPART

Aside from the use of the term "work place" in the Washington statute and the term "place of employment" in the federal statute, the two definitions of "serious violation" in RCW 49.17.180(6) and its federal counterpart are identical. The federal statute reads in pertinent part as follows:

> For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists . . . in such place of employment . . . .

29 U.S.C. § 666(k).[6]

---

[5] The Board judge's characterization of the two interpretations is helpful: "The employer apparently misapprehended the statutory definition of 'serious,' which does not refer to the possibility of injury but to the likelihood that such injury, if it did occur, would be serious or fatal." Board Record at 9.

[6] This language corresponds to § 17(k) of the Occupational Safety and Health Act of 1970. *See True Drilling Co. v. Donovan*, 703 F.2d 1087, 1089 n.1 (9th Cir. 1983).

■ When a Washington statute has the same purpose as its federal counterpart, we look to federal decisions to determine the appropriate construction of the statute. *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 118, 720 P.2d 793 (1986). There are no Washington cases interpreting the portion of the statute at issue here; therefore, interpretation of the federal counterpart is particularly relevant.

The Ninth Circuit reached this exact issue in *California Stevedore & Ballast*, 517 F.2d 986. In that case, the Occupational Safety and Health Commission argued the same interpretation L&I now asserts, namely, that the term "substantial probability" refers to the probability that any injury that occurs—regardless of the likelihood that it *will* occur—would be "death or serious physical harm." After observing that the language of 29 U.S.C. § 666(j) (identical to the language now found in subsection (k)) was "artlessly and ambiguously drafted," the court observed that the Occupational Safety and Health Administration's (OSHA) interpretation of the statute was not unreasonable and was, therefore, entitled to "a certain deference." *Cal. Stevedore & Ballast*, 517 F.2d at 988 (citing *Udall v. Tallman*, 380 U.S. 1, 16-18, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965)[7]).

Additionally, the court reasoned that OSHA's interpretation furthered the Congressional intent in establishing workplace safety standards to require employers to eliminate all foreseeable and preventable hazards:

> Where violation of a regulation renders an accident resulting in death or serious injury possible, however, *even if not probable*, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to

---

[7] In fact, the court in *Udall* characterized the deference owed to an agency's interpretation as great:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.

*Udall*, 380 U.S. at 16 (citations and internal quotation marks omitted).

obey the regulation. When human life or limb is at stake, any violation of a regulation is "serious." We therefore adopt the Secretary's construction of section 17(k).

*Cal. Stevedore & Ballast,* 517 F.2d at 988 (emphasis added).

The offending company in the *California Stevedore & Ballast* case argued that, even using the above interpretation, the "serious" label did not apply to the hatch-beam violation at issue there[8] because the agency produced no evidence that the harm would occur other than under a " 'freakish or utterly implausible concurrence of circumstances.' " *Cal. Stevedore & Ballast,* 517 F.2d at 988 n.1. This language quotes *National Realty & Construction Co. v. Occupational Safety & Health Review Commission,* 489 F.2d 1257, 1265 n.33 (D.C. Cir. 1973), a case addressing the likelihood of harm regarding the violation of OSHA's general duty clause, 29 U.S.C. § 654(a)(1). *Cal. Stevedore & Ballast,* 517 F.2d at 988 n.1.

The general duty clause provides that " '[e]ach employer . . . shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.' " *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 12-13, 100 S. Ct. 883, 63 L. Ed. 2d 154 (1980) (quoting 29 U.S.C. § 654(a)(1)). The *California Stevedore & Ballast* decision distinguished *National Realty* because the latter case involved OSHA's general duty clause instead of 29 U.S.C. § 666(k); the court explained that the likelihood of harm under 29 U.S.C. § 666(j) (now 666(k)) need not be established: "If the harm that the regulation was intended to prevent is death or serious physical injury, then its violation is serious per se." *Cal. Stevedore & Ballast,* 517 F.2d at 988 n.1.

Most circuit Courts of Appeal have adopted the *California Stevedore & Ballast* interpretation of 29 U.S.C.

---

[8] The risk of harm in *California Stevedore & Ballast* stemmed from a hatch beam on a ship on which Stevedore's employees unloaded cargo being left in place and unsecured during unloading. The evidence indicated that it was not probable that the beam would dislodge. *Cal. Stevedore & Ballast,* 517 F.2d at 987.

§ 666(k), although some courts have disallowed a "serious" designation when the harm is likely only under a "freakish or utterly implausible concurrence of circumstances."[9] None applies Lee Cook's proffered interpretation to the OSHA statute.

Additionally, L&I argues the use of the word "could" in RCW 49.17.180(6) supports its interpretation that the likelihood of an accident need be only possible. If the legislature intended the term "substantial probability" to refer to the likelihood an accident would occur at all, it argues that the word "would" would convey that meaning more clearly.[10] The Sixth Circuit drew the same conclusion from the word choice:

> [T]he Commission employed a more restrictive standard for a serious violation than that which is called for by the Act. The Commission appears to have ignored the standard that there be a "substantial probability that death or serious physical

[9] *See, e.g., Brock v. L.R. Willson & Sons,* 773 F.2d 1377, 1388-89 (D.C. Cir. 1985) (holding a violation "serious" if it could result in serious injury except under "freakish or utterly implausible . . . circumstances"); *Pratt & Whitney Aircraft v. Sec'y of Labor,* 649 F.2d 96, 98 (2d. Cir. 1981) (following *California Stevedore & Ballast* regarding aircraft manufacturer's hazardous storage of chemicals); *Kent Nowlin Constr. Co. v. Occupational Safety & Health Review Comm'n,* 648 F.2d 1278, 1282 (10th Cir. 1981) (following *California Stevedore & Ballast* regarding construction company's failure to safely maintain crane); *St. Joe Minerals Corp. v. Occupational Safety & Health Review Comm'n,* 647 F.2d 840, 847 (8th Cir. 1981) (following *California Stevedore & Ballast* regarding company's bypassing of freight elevator's safety devices); *Ill. Power Co. v. Occupational Safety & Health Review Comm'n,* 632 F.2d 25, 28 (7th Cir. 1980) (adopting interpretation proffered by L&I regarding power company's allowing employee to work on lines that were not grounded or insulated); *Bethlehem Steel Corp. v. Occupational Safety & Health Review Comm'n,* 607 F.2d 1069, 1073 (3d. Cir. 1979) (following *California Stevedore & Ballast* regarding welders' exposure to fluoride compounds and inadequate ventilation); *Usery v. Hermitage Concrete Pipe Co.,* 584 F.2d 127, 131-32 (6th Cir. 1978) (following *California Stevedore & Ballast* regarding impermissible levels of free silica in concrete operation); *Dorey Elec. Co. v. Occupational Safety & Health Review Comm'n,* 553 F.2d 357, 358 (4th Cir. (1977) (adopting interpretation proffered by L&I except under "freakish or utterly implausible . . . circumstances"); *Shaw Constr. Inc. v. Occupational Safety & Health Review Comm'n,* 534 F.2d 1183, 1185 (5th Cir. 1976) (following *California Stevedore & Ballast* regarding underground utilities trenching operations).

[10] This is the difference between a violation being found serious "if there is a substantial probability that death or serious physical harm *could* result" and "if there is a substantial probability that death or serious physical harm *would* result."

harm *could* result from a condition which exists." Instead, . . . by consistent employment of the term "would" in place of "could," [the Commission] appears rather clearly to have required a greater degree of certainty.

*Usery v. Hermitage Concrete Pipe Co.*, 584 F.2d 127, 131 (6th Cir. 1978).

Finally, as L&I explains, the likelihood that violating the regulation will result in serious or fatal harm is addressed in the penalty assessed under RCW 49.17.180(7).[11] Hanks admitted that, if the logging crew were standing where they should be, it was extremely unlikely they would be harmed if the guy lines broke. L&I claims one reason the penalty assessed was only $340 (when the statutory maximum is $7,000)[12] was because the probability of harm resulting from the violation at issue was low.

 Different statutes should be construed to give meaning to each and to avoid absurd or strained consequences. *In Eaton*, 110 Wn.2d 892, 901, 757 P.2d 961 (1988). They "must be read together to determine legislative purpose in order to achieve a 'harmonious total. statutory scheme . . . that maintains the integrity of the respective statutes.'" *Employco Pers. Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991) (quoting *State v. O'Neill*, 103 Wn.2d 853, 862, 700 P.2d 711 (1985)). In this case, the legislature clearly did not intend both subsections (6) and (7) of RCW 49.17.180 to address the probability that harm would actually occur. The legislature intended subsection (6) to assess a violation as serious if *any* harm that *could* result from the violation would be fatal or otherwise serious, and subsection (7) to assess the severity of the penalty according to the likelihood the harm *would* occur.

---

[11] L&I also mentions WAC 296-350-15030. This regulation defines how penalties are calculated and lists "[h]ow close an employee is to the hazard" as one of the factors to consider when assessing a penalty. WAC 296-350-15030. This regulation was not in effect at the time of the citations at issue.

[12] *See* RCW 49.17.180(2).

We hold that RCW 49.17.180(6) is ambiguous and adopt the interpretation embraced by the majority of the federal circuit courts when interpreting the nearly identical federal counterpart of the statute: that the statute's "substantial probability" language refers to the likelihood that, should harm result from the violation, that harm could be death or serious physical harm.

SUBJECT MATTER JURISDICTION

██ Lee Cook claims the Board and the superior court lacked subject matter jurisdiction, specifically that the Industrial Appeals judge exceeded his jurisdiction when he "determined that the firm was in violation of a WAC subsection other than the one for which [L&I] determined the firm had violated." Br. of Resp't at 3. Our review of whether the Board and the superior court lacked subject matter jurisdiction is de novo. *Bour v. Johnson*, 80 Wn. App. 643, 647, 910 P.2d 548 (1996).

Lee Cook argues that the Board exceeded its authority by changing the issues brought before it:

> The Board's scope of review is limited to those issues which the Department previously decided . . . . We find no warrant in the statutory enumeration of the board's powers . . . for the contention that the board can, on its own motion, change the issues brought before it by a notice of appeal and enlarge the scope of the proceedings.

Br. of Resp't at 3-4 (citing *Hanquet v. Dep't of Labor & Indus.*, 75 Wn. App. 657, 661-62, 879 P.2d 326 (1994), *review denied*, 125 Wn.2d 1019 (1995) (internal citations and quotation marks omitted).

In its brief Lee Cook appears to argue that the Board decided Item 1-1 on a different basis than that L&I alleged. But the L&I citation alleged a violation of former WAC 296-54-543(7)(b) and the Industrial Appeals Board judge affirmed that Lee Cook violated that provision. The judge ruled on the same regulation referenced in the citation. The Board adopted the judge's decision. The Board and the superior court properly exercised their subject matter jurisdiction.

■ L&I characterizes Lee Cook's subject matter jurisdiction argument to be that the Board affirmed only one of three instances under Item 1-1. The regulation itself clearly lists the seven subsections in the disjunctive, requiring the removal of wire rope when *"any* of the following [seven] conditions exist." *See* Former WAC 296-54-543(7)(b) (1979) (emphasis added). Lee Cook provides no authority to support its argument that the Board must affirm all instances of a violation in an item, and we perceive no connection to such a theory and the presence or absence of subject matter jurisdiction.

Even if the Board erred in upholding Item 1-1 when it affirmed only one instance of three alleged in that citation, such an error would not strip the Board or the superior court of subject matter jurisdiction as Lee Cook claims.[13]

We reverse the superior court and reinstate the decision of the Board.

MORGAN and HOUGHTON, JJ., concur.

---

[13] Additionally, it appears that Lee Cook conceded this argument below. Only the trial briefs and the ruling of the superior court were made part of the record, so it is impossible to know exactly what Lee Cook argued to the court below. But in his opening remarks, the trial judge made the following statement:

An initial reading of [Lee Cook's] brief raised a number of issues that are not now before me and I appreciate the issues being narrowed and clarified. The State's brief . . . indicated that the issues were more narrow and [Lee Cook's counsel] has today acknowledged that there is no need to go into the issue of subject matter jurisdiction.

Report of Proceedings (June 6, 2000) at 2. If indeed the Board and the superior court lacked subject matter jurisdiction, that issue of course could not be waived or conceded, as subject matter jurisdiction may be raised at any time. *Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 556, 958 P.2d 962 (1998). But counsel did not present persuasive briefing on the issue to this court and we perceive no merit in the claim. We will not address it further.