# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STAFFMARK INVESTMENT, LLC, | No. 52837-1-II |
| Respondent, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Staffmark Investment, LLC appeals from the superior court's judgment and order affirming the Board of Industrial Insurance Appeals' (Board) decision and order. Braden Strumsky, a worker hired by Staffmark, crushed his foot working at a warehouse operated by Expeditors International of Washington. The Department of Labor and Industries (Department) cited Staffmark, as a joint employer, for safety violations under the Washington Industrial Safety and Health Act of 1973 (WISHA).[1] Staffmark argues that (1) substantial evidence does not support the Board's determination that Staffmark was an employer under the economic realities test, and (2) substantial evidence does not support the Board's determination that Staffmark had constructive knowledge about the violations. We disagree and affirm.

---

[1] Ch. 49.17 RCW.

FACTS

I. JOB SITE CITATION

Staffmark is an employment agency that provides employees to Expeditors[2] under a service providers' agreement. Staffmark provided onsite general labor, such as forklift drivers, along with leads and quality control management. Staffmark provided onsite supervision through a manager and granted supervisory responsibilities to some of the leads. Both Staffmark and Expeditors maintained onsite managers and both designated employees as leads for each team. Expeditors directly employs a warehouse supervisor.

As part of the contract with Expeditors, Staffmark charged Expeditors for the employees' wages, plus a negotiated markup. Staffmark paid the employees' wages including workers' compensation insurance and health care benefits. Staffmark passed these costs to Expeditors through the markup charge for each employee. Expeditors requested additional labor from Staffmark according to the volume of business and Staffmark hired additional employees to fill those needs.

Staffmark employees filled two roles for Expeditors: (1) unloading containers, and (2) putting away cargo at the warehouse. CP at 921. Under the service provider's agreement, Expeditors paid Staffmark a 39 percent markup for general workers, and a 42 percent markup for forklift operators.

Staffmark hired Strumsky and then leased him to Expeditors as a general worker. Andy Johnson, Staffmark's onsite manager, interviewed and hired Strumsky to fill the position at the

---

[2] Expeditors International of Washington is a shipping and receiving facility that employs workers via Staffmark. Expeditors is not a party in this litigation.

Expeditors warehouse where Strumsky was injured. Johnson oversaw Staffmark employees at four of Expeditors' facilities. He worked on a daily basis and also maintained a permanent workstation at the facility where Strumsky was injured. Johnson conducted daily walkthroughs of the facility.

Johnson provided Strumsky's new-hire orientation, which consisted of a tour of the warehouse and an explanation of the types of freight that Strumsky would be handling. Johnson also reviewed Staffmark employee timesheets and administered payroll.

Johnson had the ultimate authority to discipline or terminate Staffmark employees, including Strumsky, who were not meeting client standards. Johnson could also reassign employees who did not "fit in with [a] particular work group" to another client. Clerk's Papers (CP) at 1081. On occasion, Johnson would terminate a Staffmark employee for "no-call, no-show," or gross negligence. CP at 1073.

Expeditors divided the work into teams that typically consisted of two general workers and one forklift operator. The general workers worked with a forklift operator to unload goods from the container onto pallets. The Staffmark leads were general workers or forklift operators who Staffmark paid a higher wage to take on more responsibility. If Expeditors needed a Staffmark employee to assume a lead position, Johnson–Staffmark's onsite manager–arranged for Expeditors to interview prospective leads. The Staffmark leads still reported to Staffmark even after being promoted by Expeditors.

Johnson and the Staffmark leads helped ensure that Staffmark employees followed safety standards. Johnson attended monthly safety meetings along with Staffmark and Expeditors leads

3

and Expeditors supervisors. In his daily walkthroughs of the facility, Johnson looked for safety issues and ensured that Staffmark workers wore personal protective equipment.

Both Staffmark and Expeditors leads were assigned to Strumsky's shift. Staffmark leads ensured that their team followed the client's dress code and wore the appropriate protective equipment. Both leads were responsible for immediate discipline of Staffmark workers. Both leads referred more serious or on-going issues to Johnson because Staffmark leads could only reassign a Staffmark worker with Johnson's approval.

Both Staffmark and Expeditors leads attended daily shift meetings with Expeditors supervisors to discuss staffing and safety issues and to receive work orders. Johnson often participated in these meetings. The Staffmark lead during Strumsky's shift, Jeffrey Thysell, told Strumsky when to report to work. Ricky Maghanoy was the Expeditors lead during Strumsky's shift. If Strumsky ever ran late, he would contact the Staffmark lead, Thysell. Maghanoy and Thysell distributed the workload among the teams before the start of each shift.

Staffmark and Expeditors shared responsibility for training and certifying forklift operators. Staffmark assigned employees to the position of forklift operator if that employee had experience operating powered industrial trucks. Staffmark verified each employee's experience by providing a written test to prospective forklift operators. After the employee passed the test, Staffmark approved the employee for practical training.

Staffmark's onsite manager or lead traditionally administered and scored the test. Staffmark's staff gave Expeditors a blank copy of the test, and Johnson knew that Expeditors' employees provided the test to forklift trainees while Strumsky worked there. After an employee passed the test, Expeditors provided practical training on the site-specific equipment. Expeditors

4

then certified the employee as a forklift operator and notified Staffmark of the change in position so that the employee could receive higher pay.

Neither Staffmark nor Expeditors gave Strumsky the written test or certified him before he began operating a forklift. The only information Strumsky received regarding the operation of forklifts before he operated one was (1) an employee handbook that mentioned that a worker should not operate a forklift without Staffmark's permission, and (2) a short video that described general safety topics.

Strumsky believed he was following the appropriate process for becoming a forklift operator. He asked Maghanoy, the Expeditors' lead during his shift, about becoming a forklift operator. Maghanoy discussed the possibility of training Strumsky with Thysell, the Staffmark lead assigned to Strumsky's shift. Maghanoy asked for approval from the Expeditors supervisor before training Strumsky to drive a forklift. Maghanoy knew that Strumsky was not "signed off completely" because "Staffmark wasn't really following up" when Expeditors asked to train forklift operators. CP at 1044.

Maghanoy allowed Strumsky to operate the Expeditors forklifts in five or six sessions over a period of a month. Each session lasted about an hour. While most of the driving took place away from the main work area, the activity was still visible to the other employees in the warehouse. Other forklift operators often drove by the space where Strumsky was operating the forklift. Strumsky twice drove in a circle around the other workers.

On October 1, 2015, Strumsky suffered serious injuries when he lost control of the stand-up forklift he was operating. Strumsky spent an hour unloading freight using a forklift. When he

5

finished, he drove the forklift 100 feet across the warehouse, lost control of the forklift, and crushed his left foot against a support beam.

After conducting an investigation, the Department cited Staffmark for the following two WISHA violations:

> 1-1a. Serious. [WAC] 296-863-60005. Employer did not ensure employee successfully completed an operator training program before operating PITs (Powered Industrial Trucks).

> 1-1b. Serious. [WAC] 296-863-40010. Employer did not ensure operator operated PITs (Powered Industrial Trucks) according to the manufacturer's instructions and kept PITs under control at all times.

CP at 1329. Both violations were characterized as "serious." CP at 1329, 865.

## II. STAFFMARK APPEALS TO THE BOARD

Staffmark appealed to the Board, arguing that Staffmark was not an employer for the purposes of WISHA. The Board rejected Staffmark's argument, deciding that the Department properly cited Staffmark for safety violations at a joint employer work site because both employers exercised substantial control over the injured forklift driver and both were responsible for the safety violations. The Board affirmed the citations.

The Board found that "Staffmark at least had constructive knowledge that Mr. Strumsky was operating the forklift in plain view on numerous occasions, and a Staffmark lead was aware he was being trained as a forklift driver." CP at 68. The Board made the following relevant findings of fact:[3]

---

[3] Although Staffmark assigns error to findings of fact 2 through 8, Staffmark only provides argument to challenge findings of fact 3 and 6.

3. During at least the month of October 2015, Staffmark and Expeditors both exercised substantial control over the workforce and workplace conditions at the Expeditors' 24th Street Sumner facility. Both companies had lead workers and managers/supervisors assigned to the jobsite. Both companies provided substantial control of the work at the Expeditors' 24th Street Sumner facility, and both could discipline Staffmark employees. Staffmark employees' wages were established based on the companies negotiated Service Providers' Agreement.

. . . .

6. On October 1, 2015, Staffmark and Expeditors jointly controlled the worksite and Staffmark employees at the Expeditors' 24th Street Sumner facility at the time of the forklift accident at issue.

CP at 69-70.

The Board made the following relevant conclusions of law:[4]

2. On October 1, 2015, Staffmark and Expeditors were joint employers at the time of the forklift accident and both had control of the worksite and Staffmark employees at the joint employer worksite at the Expeditors' 24th Street Sumner facility; therefore, Staffmark was properly cited for safety violations on February 17, 2016, pursuant to *In Re Skills Resource Training Center*, BIIA Dec., 95 253 (1997).

CP at 70-71.

### III. STAFFMARK APPEALS TO THE SUPERIOR COURT

Staffmark appealed to the superior court, which also rejected its argument that it was not an employer for WISHA purposes. The superior court affirmed the Board's decision and order. Staffmark now appeals to this court.

---

[4] Although Staffmark assigns error to conclusions of law 2 through 6, Staffmark only provides argument to challenge conclusion of law 2.

ANALYSIS

Staffmark argues that the Board erred by determining that Staffmark was an employer for the purposes of WISHA because Staffmark lacked sufficient control over the workers and the worksite and did not create or control the hazard. Staffmark further argues that the Board erred by determining that Staffmark had constructive knowledge of Strumsky operating the forklift in plain view because the forklift trainings were for short periods of time and away from where workers customarily worked. The Department argues that substantial evidence supports the Board's determination that Staffmark was an employer under the economic realities test. The Department further argues that substantial evidence shows that Staffmark knew or should have known that the worker was operating a forklift without being trained because he operated the forklift in plain view. We agree with the Department.

## I. STANDARD OF REVIEW

The purpose of WISHA is to assure, insofar as may be reasonably possible, safe and healthful workplace conditions for every person in the state of Washington. RCW 49.17.010. "As a remedial statute, WISHA and its regulations are liberally construed to carry out its purpose." *Elder Demolition, Inc. v. Dep't of Labor & Indus.*, 149 Wn. App. 799, 806, 207 P.3d 453 (2009).

"In a WISHA appeal, we review the Board's decision directly based on the record before the Board." *Potelco, Inc. v. Dep't of Labor & Indus.*, 191 Wn. App. 9, 21, 361 P.3d 767 (2015). "And we review the Board's findings of fact to determine whether they are supported by substantial evidence . . . as a whole and whether those findings support the conclusions of law." *Potelco*, 191 Wn. App. at 21. "The Board's findings of fact are conclusive if substantial evidence supports them." *Potelco*, 191 Wn. App. at 21. "'Substantial evidence is evidence in sufficient

quantum to persuade a fair-minded person of the truth of the declared premises.'" *Potelco*, 191 Wn. App. at 21-22 (internal quotation marks omitted) (quoting *Pilchuck Contractors, Inc. v. Dep't of Labor & Indus.*, 170 Wn. App. 514, 517, 286 P.3d 383 (2012)). "Under the substantial evidence standard of review, our review is limited to the examination of the record and we will not reweigh the evidence." *Potelco*, 191 Wn. App. at 22. "Unchallenged findings of fact are verities on appeal." *Potelco*, 191 Wn. App. at 22.

"We give substantial weight to an agency's interpretation within its area of expertise, and we will uphold that interpretation if it is a plausible construction of the regulation and not contrary to the legislative intent." *Potelco*, 191 Wn. App. at 22.

## II. NON-DELEGABLE DUTY

Staffmark argues that it did not create the hazard, control the hazard, or have any responsibility to correct the hazard. The Department argues this this claim is not supported by the facts. We hold that Staffmark, as an employer, owed Strumsky a non-delegable duty to comply with WISHA regulations.

RCW 49.17.020(4) defines an "employer" as any firm that "engages in any business, industry, profession, or activity in this state and employs one or more employees . . . ." All employers have a non-delegable duty to protect their employers under both WISHA. RCW 49.17.060; *Afoa v. Port of Seattle,* 176 Wn.2d 460, 470-71, 296 P.3d 800 (2013). "[I]t is settled law that jobsite owners have a specific duty to comply with WISHA regulations if they retain control over the manner and instrumentalities of work being done on the jobsite." *Afoa*, 176 Wn.2d at 472. "[T]his duty extends to all workers on the jobsite that may be harmed by WISHA violations." *Afoa*, 176 Wn.2d at 472.

Here, Staffmark failed to protect Strumsky from the hazard of operating a forklift improperly because it did not ensure that he understood and completed the process for forklift operation certification before operating a forklift at the jobsite. Accordingly, Staffmark, as an employer, owed Strumsky a non-delegable duty to comply with WISHA regulations.

### III. STAFFMARK IS AN EMPLOYER UNDER WISHA

Staffmark argues that it was not an "employer" for purposes of WISHA and thus, it cannot be held liable as a joint employer under the economic realities test for violations committed by Strumsky because it lacked sufficient control over the workers and the worksite and did not create or control the hazard. Thus, Staffmark claims that the Board's decision is not supported by substantial evidence and must be reversed. The Department responds that Staffmark is not excused from complying with safety requirements because they were the primary employer who leased its employee to Expeditors. Br. of Resp. at 14-15. We hold that the Board properly determined that under the economic realities test, Staffmark is liable as a joint employer under WISHA.

Under WISHA, employers are responsible for the safety and health of their employees. RCW 49.17.060. Courts interpret WISHA liberally to provide wide protection to workers. *Frank Coluccio Const. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 36, 329 P.3d 91 (2014). Under multi-employee worksite liability, employers have a specific duty to comply with WISHA regulations, which extends "to all employees" who may be harmed by an employer's violation of the WISHA regulations. *Afoa*, 176 Wn.2d at 471-72. Therefore, to advance WISHA's safety objectives, the Department may cite multiple employers for violating workplace safety standards. *Afoa*, 176 Wn.2d at 472. "Washington courts look to federal cases interpreting the Occupational

10

Safety and Health Act of 1970 (OSHA)[5] as persuasive authority for how to apply the provisions of WISHA because WISHA parallels OSHA." *Potelco*, 191 Wn. App. at 30 (citing *Lee Cook Trucking & Logging v. Dep't of Labor & Indus.*, 109 Wn. App. 471, 478, 36 P.3d 558 (2001)).

"When there is a WISHA violation involving leased or temporary employees, the Board uses the 'economic realities test' to determine which employer should be issued the WISHA citation." *Potelco*, 191 Wn. App. at 30. The economic realities test requires the Board to analyze:

1) who the workers consider their employer;

2) who pays the workers' wages;

3) who has the responsibility to control the workers;

4) whether the alleged employer has the power to control the workers;

5) whether the alleged employer has the power to fire, hire, or modify the employment condition of the workers;

6) whether the workers' ability to increase their income depends on efficiency rather than initiative, judgment, and foresight; and

7) how the workers' wages are established.

*Potelco*, 191 Wn. App. at 31 (quoting *In re Skills Res. Training Ctr.*, No. 95 W253, 1997 WL 593888, at *4 (Wash. Bd. of Indus. Ins. Appeals Aug. 5, 1997)). The key question is whether the employer has the right to control the worker. *Potelco*, 191 Wn. App. at 31. That is the only disputed portion of the economic realities test at issue in this case.

Staffmark argues that the Board improperly concluded that Staffmark controlled the workers. We disagree.

---

[5] 29 U.S.C. § 651.

As to whether Staffmark, as the alleged employer, has the power to control the workers, Staffmark retained the authority to discipline or terminate an employee because Johnson had the ultimate authority to discipline or terminate Staffmark employees who were not meeting client standards. Johnson could also reassign employees who did not "fit in with [a] particular work group" to another client. CP at 1081. Thus, because Staffmark had the power to control the workers, Staffmark was the employer.

The Board considered all of the factors of the economic realities test and properly concluded that Staffmark was a joint employer. Accordingly, we agree with the Board and hold that that Staffmark was a joint employer under the economic realities test because it had the power to control the workers and we affirm the Board's order.

IV. EMPLOYER KNOWLEDGE

Staffmark argues that the Board erred by determining that Staffmark had constructive knowledge that Strumsky was operating the forklift in plain view because the forklift trainings were for short periods of time and away from where other employees customarily worked. The Department argues that substantial evidence shows that Staffmark knew or should have known that Strumsky was operating a forklift without being trained because he operated the forklift in plain view of other employees in the warehouse. We hold that substantial evidence supports the Board's finding that Staffmark had constructive knowledge of the violations.

"Under WISHA, an employer has a general duty to employees to provide employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death and a specific duty to comply with the rules, regulations, and orders promulgated under WISHA." *Pro-Active Home Builders, Inc. v. Dep't of Labor & Indus.*, 7 Wn. App. 2d 10, 16-17,

432 P.3d 404 (2019). "'RCW 49.17.180(2) mandates the assessment of a penalty against an employer when a proven violation is serious." *Pro-Active Home Builders*, 7 Wn. App. 2d at 17 (internal quotation marks omitted) (quoting *J.E. Dunn Northwest, Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 35, 44, 156 P.3d 250 (2007)).

> A "serious" violation of a WISHA regulation is defined as follows:
>
> [A] serious violation shall be deemed to exist in a workplace if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such workplace, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

RCW 49.17.180(6).[6]

"When alleging a violation of WISHA regulations against an employers, the Department bears the initial burden of proving the existence of that violation." *Pro-Active Home Builders*, 7 Wn. App. 2d at 17. "When an alleged violation is designated as 'serious,' the Department bears the burden of proving not only the existence of the elements of the violation itself, but also the existence of those additional elements of a 'serious' violation enumerated in RCW 49.17.180(6)." *Pro-Active Home Builders*, 7 Wn. App. 2d at 17 (citing *J.E. Dunn*, 139 Wn. App. at 44).

---

[6] The legislature amended RCW 49.17.180 in 2018. LAWS OF 2018, ch. 128 § 1. Because these amendments are not relevant here, we cite to the current version of this statute.

Accordingly, to establish its prima facie case in regard to a serious violation of a WISHA regulation, the Department must prove each of the following elements:

(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.

*Pro-Active Home Builders*, 7 Wn. App. 2d at 17-18 (internal quotation marks omitted) (quoting, *Washington Cedar & Supply Co. v. Dep't of Labor & Indus.*, 119 Wn. App. 906, 914, 83 P.3d 1012 (2003)). Staffmark challenges the knowledge element. Br. of App. at 9, 22.

"An employer's knowledge can be actual or constructive, and common knowledge can be used to establish that a hazard is recognized." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18.

Here, the Board found that "Staffmark at least had constructive knowledge that Mr. Strumsky was operating the forklift in plain view on numerous occasions, and a Staffmark lead was aware he was being trained as a forklift driver." CP at 68. We, therefore, examine whether substantial evidence shows constructive knowledge. *Potelco*, 191 Wn. App. at 21

"In general, constructive knowledge is established where the employer in the 'exercise of reasonable diligence' could have become aware of the condition." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18 (quoting RCW 49.17.180(6)). "'Reasonable diligence involves several factors, including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.'" *Pro-Active Home Builders*, 7 Wn. App. 2d at 18 (internal quotation marks omitted) (quoting *Erection Co., Inc. v. Dep't of Labor & Indus.*, 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011)). "Constructive knowledge may be demonstrated by the Department in a number of ways, including evidence

14

showing that the violative condition was readily observable or in a conspicuous location in the area of the employer's crews." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18.

The record shows that Strumsky was trained in an open warehouse where it was possible for other employees and supervisors to see him operate the forklift without proper training. CP at 1150-51. In the month leading up to the accident, Strumsky operated the forklift "five or six times." CP at 1150. Each session was "[a]bout an hour." CP at 1151. The Staffmark lead during Strumsky's shift, Thysell, discussed the possibility of training Strumsky with Maghanoy. CP at 1119. When Strumsky was asked if he believed Thysell saw him, he said, "Yeah. Yeah. He was on the forklift pretty much the whole day. I mean, it would be kind of shocking if he didn't see me." CP at 1147.

Based on these facts, the violative conditions as set forth in the Department's WISHA violations 1-1a and 1-1b were readily observable to Staffmark. Staffmark could have become aware of the conditions with the "exercise of reasonable diligence." RCW 49.17.180(6). Thus, substantial evidence supports the Board's finding that Staffmark had constructive knowledge of both violations.

Given the legislature's expansive definitions of "employer" and "employee," holding Staffmark liable as a joint employer on this record supports the legislature's directive to establish "safe and healthful working conditions." RCW 49.17.010, .020.

No. 52837-1-II

CONCLUSION

We affirm the superior court's judgment and order affirming the Board's order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, C.J.

MELNICK, J.

16