[No. 37082-4-II. Division Two. February 24, 2009.]

ELDER DEMOLITION, INC., *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

*Aaron K. Owada* (of *AMS Law, PC*), for appellant.

*Robert M. McKenna, Attorney General*, and *Margaret A. Breysse, Assistant*, for respondent.

¶1 PENOYAR, A.C.J. — Elder Demolition Inc. worked as a subcontractor demolishing a steel rail car tipper at the Port of Kalama in October 2004. Responding to an anonymous tip, the Washington Department of Labor and Industries (Department) opened an investigation into Elder's work practices on October 18, 2004. The Department cited Elder

for several violations of workplace safety conditions under the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW. The Department classified several of these violations as "serious" and "willful." Elder appealed the citations to the Board of Industrial Insurance Appeals (Board) and to Cowlitz County Superior Court on the basis that they are not supported by substantial evidence. Both venues affirmed the violations, as do we.

## FACTS

I. PROJECT

¶2 In October 2004, the Port of Kalama contracted with Hollinger Construction to upgrade their rail receiving system. Part of this project required the demolition and removal of an old rail car tipper. To complete this work, Hollinger subcontracted with Elder Demolition. Work started on October 12, 2004. Elder's portion of the project, under the contract terms, was to be completed no later than December 31, 2004.

¶3 Elder's project manager, Allen (Al) Kackman, testified that before beginning work, he attended a meeting with Rick Vroom, Hollinger Construction's project manager, and Mark Wilson, manager of planning for the Port of Kalama. Kackman recalled the date of that meeting to be October 8, 2004. At that meeting, Kackman testified that he asked for a copy of the hazardous materials survey. There was no such report, but Kackman testified that Wilson made oral representations to him at the meeting that there were no hazardous materials on site and that Wilson would write him a letter to that effect. Kackman did not ask Wilson specifically about the possibility of lead. Kackman did not receive a letter from Wilson, nor did he follow up with Wilson on the issue of hazardous materials or the presence of lead. Wilson later testified that he does not know Kackman, that he does not recall speaking with anyone from Elder about the lead issue, and that at no time did he represent whether lead was present at the jobsite.

¶4 Demolition of the rail car tipper required disassembling a metal structure with a cutting torch. After demolition began, on October 12, 2004, the project foreman, Josh Malone, noticed that some of the steel structures were covered in paint. Upon making this discovery, Malone called Kackman, informed him about the paint, and suggested he send a sample for lead testing. Malone took a sample of the paint, bagged it, and gave it to their delivery person to take to Kackman. Meanwhile, Elder's demolition team kept working at Kackman's direction. Malone called Kackman "a few times a day" for the next few days, inquiring as to the status of the paint. Report of Proceedings (RP) (June 6, 2006) at 55. Kackman told Malone that "he was going to turn it in and -- or that he had turned it in, and he was waiting for results. . . ." RP (June 6, 2006) at 56. Malone testified that Kackman "told [him] that he would get it tested, and [to] keep going." RP (June 6, 2006) at 56.

¶5 Vroom became aware of the possibility of lead paint on October 12, 2004, when Malone alerted a Hollinger superintendent. Vroom then contacted Kackman to inform him that the contract was silent on the presence of lead paint and that he had no personal knowledge of lead paint at the site. Vroom encouraged Kackman to have a sample of paint tested if he believed it might contain lead. Vroom told Kackman, "If the results are positive, we will approach the Owner immediately." Ex. 10, at 1. Kackman responded to Vroom that same day, stating that the property owner should provide Elder with a "hazardous material survey" before they start work. Ex. 10, at 2. Kackman indicated that he would have Malone ask for the document and review it. If no survey had been conducted or if the survey denoted the presence of lead paint, Kackman told Vroom they would "proceed according to the applicable regulations." Ex. 10, at 2.

¶6 Kackman could not recall when he received the paint sample Malone collected. It could have arrived at his office on Wednesday, October 13, or Thursday, October 14, 2004. Kackman did not direct the workers to stop demolition until

the sample was analyzed because "[i]t was a paint sample at that point. It was not a lead sample." RP (June 6, 2006) at 19-20. Kackman failed to send the paint sample to the laboratory until the following Monday.

¶7 Kackman testified that he was very busy and that he "forgot" to send the sample in for several days. RP (June 6, 2006) at 25. He testified that he was not in a great rush to get the sample tested because he believed there was no lead present at the site. When asked why he got the sample tested at all, considering his belief that there was no lead on site, Kackman responded that he "had questions in [his] own mind, and [he] wanted the reassurance for [his] own purposes." RP (June 6, 2006) at 26. Kackman delivered the paint sample to Jones Environmental Laboratory, Inc., on October 19, 2004, the day after the Department stopped work at the jobsite because of lead found in the paint.

## II. WISHA INVESTIGATION

¶8 Several days after Elder began its demolition of the old rail tipper, a worker for United Harvest, a grain handling company, called the WISHA hot line to report that he had seen some Elder employees "cutting into bad materials" and that they should investigate.[1] RP (June 2, 2006) at 110.

¶9 Responding to the tip, WISHA Compliance Officer Wendy Drapeau inspected the Elder work site on October 18, 2004. She conducted an opening conference with the site foreman, Malone. Drapeau learned that plasma torch cutting had started on October 12. The pair then walked around the site and discussed the possibility of lead paint. Malone told her that he had given a sample of the orange paint to Kackman and that it was being tested. Drapeau performed several "wipe" tests on the paint that denoted the "strong" presence of lead. RP (May 30, 2006) at 30.

---

[1] This same employee testified that he spoke to several Elder employees, telling them that based on what he knew from others who had worked in the port, the orange paint on the rail tipper was "some of the worst lead [they'd] ever[ ] cut into." RP (June 6, 2006) at 108.

Drapeau also performed wipe tests in the work area and in the restroom Elder used and took several samples of paint for later analysis. Drapeau directed Malone to suspend demolition operations at the rail tipper.

¶10 Over the next several days, Drapeau performed more tests at the jobsite, including air monitoring during torch cutting. Drapeau determined from those tests that actual exposure to someone using a torch cutter, without proper respiration protection, would be 2601 micrograms per cubic meter ($\mu g/m^3$) of lead for an eight hour time weighted average (TWA). Under WAC 296-155-17607(1), the permissible exposure level for lead is only 50 $\mu g/m^3$ for an eight hour TWA. Drapeau took the air sample with only one person cutting the paint covered steel, but from October 12 through 18, there were three people cutting at once, without proper respiration or lead-safety equipment.

¶11 Those who had worked on the steel had blood samples taken to determine the amount of lead in their blood. Under WAC 296-155-17623(1)(a), an employer is required to remove an employee from work on each occasion that a periodic and follow-up blood test indicates that the employee's blood lead level is at or above 50 $\mu g/dl$. Three Elder employees, Malone, Sean Brunson, and Bartow had high enough blood levels of lead that they had to submit to follow-up testing and wait until the levels lowered to permissible levels before returning to work.

III. PROCEEDINGS BELOW

¶12 On April 1, 2005, the Department cited Elder for multiple violations. They included 1 willful violation of WISHA's worker safety and health standards (consisting of 3 code violations grouped together), 14 serious violations (some grouped), and 5 general violations. Generally, the violations stemmed from Elder's failure to identify the lead paint and the lack of proper safety equipment and precautions taken given the presence of lead paint. Total penalties for the violations were $26,400.

¶13 Elder appealed the citation to the Board industrial appeals judge (IAJ). After hearing testimony from the parties and considering pleadings, the IAJ affirmed the citations, with some modifications, in a proposed decision and order. The IAJ vacated several items as repetitive and also vacated several after determining that the Department did not adequately prove them. The IAJ entered detailed findings in affirming the willfulness of three violations, citing Kackman's behavior as a basis. The resulting penalty after the IAJ decision was $25,200.

¶14 Elder appealed the IAJ's decision to the Board. The Board denied Elder's petition for review and adopted the IAJ's proposed decision and order as the Board's final decision and order. Elder appealed the Board's decision to Cowlitz County Superior Court, where, following a bench trial, the court affirmed the Board's order.

¶15 Elder now appeals to this court.

## ANALYSIS

### I. "SERIOUS" VIOLATIONS

¶16 Elder argues that the Board erred as a matter of law by concluding that the Department established all elements of a "serious" violation under RCW 49.17.180(6). The State urges us to disregard this argument, and at oral argument, Elder conceded that the violations were "serious." We do not address this conceded issue further.

### II. "WILLFUL" VIOLATIONS

¶17 Elder argues that substantial evidence does not support the Board's determination that violations 1-1a, 1-1b, and 1-1c were willfully committed.[2] The Department disagrees, as do we.

---

[2] Violation 1-1a is a violation of WAC 296-155-17607(1), which states, "The employer shall assure that no employee is exposed to lead at concentrations greater than fifty micrograms per cubic meter of air . . . averaged over an 8-hour period." Violation 1-1b is a violation of WAC 296-155-17609(1)(a), which states, "Each employer who has a workplace operation covered by this standard shall

## A. WISHA Background

 ¶18 WISHA's purpose is to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington . . . ." RCW 49.17.010. As a remedial statute, WISHA and its regulations are liberally construed to carry out its purpose. *Prezant Assocs., Inc. v. Dep't of Labor & Indus.*, 141 Wn. App. 1, 7-8, 165 P.3d 12 (2007) (citing *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 146, 750 P.2d 1257 (1988)). " '[R]egulations promulgated pursuant to WISHA . . . must also be construed in light of WISHA's stated purpose.' " *Prezant Assocs.*, 141 Wn. App. at 8 (alterations in original) (quoting *Adkins*, 110 Wn.2d at 146).

██ ██ ¶19 When reviewing Washington statutes that share their purpose with a federal counterpart, we look to federal decisions to determine the appropriate construction of the statute in question. *Lee Cook Trucking & Logging v. Dep't of Labor & Indus.*, 109 Wn. App. 471, 478, 36 P.3d 558 (2001). This applies also to WISHA provisions where, when reviewing, we "will also consider . . . federal decisions interpreting OSHA [(Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678)]." *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 336, 24 P.3d 424 (2001).

## B. Standard of Review

██ ¶20 In a WISHA appeal, the Board's findings of fact are conclusive if substantial evidence supports them. RCW 49.17.150; RCW 34.05.570(3)(e); *Prezant Assocs.*, 141 Wn. App. at 7; *Inland Foundry Co.*, 106 Wn. App. at 340.

---

initially determine if any employee may be exposed to lead at or above the action level." Violation 1-1c is a violation of WAC 296-155-775(9), which states:

It shall be determined whether asbestos, hazardous materials, hazardous chemicals, gases, explosives, flammable materials, or similarly dangerous substances are present at the work site. When the presence of any such substance is apparent or suspected, testing and removal or purging shall be performed and the hazard eliminated before demolition is started. Removal of such substance shall be in accordance with the requirements of chapters 296-62 and 296-65 WAC.

"Substantial evidence" is " 'evidence in sufficient quantum' " to persuade a fair-minded person that a finding is true. *Martinez Melgoza & Assocs., Inc. v. Dep't of Labor & Indus.*, 125 Wn. App. 843, 847-48, 106 P.3d 776 (2005) (internal quotation marks omitted) (quoting *In re Welfare of Snyder*, 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975)). We then review the findings to determine if they support the conclusions of law. RCW 49.17.150; *Prezant Assocs.*, 141 Wn. App. at 7; *Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus.*, 136 Wn. App. 1, 4, 146 P.3d 1212 (2006).

C. Willful Violations

¶21 RCW 49.17.180(1) and OSHA, 29 U.S.C. § 666, use nearly identical statutory language to set out the penalties for willful violations.[3] Neither act, however, defines the term "willful." The Board here found that a "willful violation" is one involving a "voluntary action, done either with an intentional disregard of or plain indifference to the requirements of the statute." Administrative Record (AR) at 72. This is the definition federal courts also apply in the OSHA context. *In re Erection Co. (II)*, No. 88 W142 (Wash. Bd. of Indus. Ins. Appeals Nov. 8, 1990); *see also Nat'l Steel & Shipbuilding Co. v. Occupational Safety & Health Review Comm'n*, 607 F.2d 311, 314 (9th Cir. 1979). Neither the Department nor Elder challenges the use of this definition.

---

[3] RCW 49.17.180(1) states:

Except as provided in RCW 43.05.090, any employer who willfully or repeatedly violates the requirements of RCW 49.17.060, of any safety or health standard promulgated under the authority of this chapter, of any existing rule or regulation governing the conditions of employment promulgated by the department, or of any order issued granting a variance under RCW 49.17.080 or 49.17.090 may be assessed a civil penalty not to exceed seventy thousand dollars for each violation. A minimum penalty of five thousand dollars shall be assessed for a willful violation.

29 U.S.C. § 666(a) states:

Any employer who willfully or repeatedly violates the requirements of section 654 of this title, any standard, rule, or order promulgated pursuant to section 655 of this title, or regulations prescribed pursuant to this chapter may be assessed a civil penalty of not more than $70,000 for each violation, but not less than $5,000 for each willful violation.

¶22 The enhanced penalties for a willful violation are not predicated on the degree of danger caused by the violation but, instead, the "particularly improper 'state of mind'" with which the safety standard is violated. *Nat'l Steel & Shipbuilding Co.*, 607 F.2d at 315 n. 6 (quoting *Todd Shipyards Corp. v. Sec'y of Labor*, 586 F.2d 683, 685 (9th Cir. 1978)). "An employer need not harbor malicious motives or possess a 'specific intent' to violate a provision of the Act in order to commit a willful violation," however. *Ensign-Bickford Co. v. Occupational Safety & Health Review Comm'n*, 230 U.S. App. D.C. 362, 717 F.2d 1419, 1423, *cert. denied*, 466 U.S. 937 (1984). Instead, a plain indifference to safety requirements is sufficient by itself to establish a willful violation. *Ensign-Bickford Co.*, 717 F.2d at 1422-23.

¶23 Challenging the Board's conclusion, Elder asserts that the record contains no evidence that it had actual knowledge of the unlawful condition, which Elder claims is a necessary part of the determination. This assertion is incorrect, however, as actual knowledge of the unlawful condition is not required. As the First Circuit has explained, "an act may be 'willful' if the offender shows 'indifference' to the rules; he need not be consciously aware that the conduct is forbidden at the time he performs it, but his state of mind must be such that, if he were informed of the rule, he would not care." *Brock v. Morello Bros. Constr., Inc.*, 809 F.2d 161, 164 (1st Cir. 1987).

¶24 The Board explained at length its reasoning for making the willful determination. It noted that neither Elder's president nor the job foreman's actions were a factor in the decision; rather it was the behavior of the project manager Kackman that was of importance. The Board stated:

In Al Kackman, there resided together as of October 12, 2004, (1) knowledge that paint covered the steel that his crew was torch-cutting as related by Josh Malone, (2) sufficient, even if imperfect, knowledge of the lead in construction standards to prevent the violations from having occurred in that he understood that before work began he must have a hazardous

material survey (which he knew he had not received) or have a paint sample analyzed himself (Exhibit No. 10) . . . . Mr. Kackman had at all times (3) responsibility for managing the entire project which necessarily includes responsibility for preventing safety violations, and (4) authority to initiate all actions necessary to avoid the violations. In short, as of October 12, 2004, Mr. Kackman had the requisite factual and safety-standard knowledge, responsibility, and authority to compel that he stop the work and ensure the safety of his employees. Yet, he did not do so.

AR at 73.

¶25 The Board supported its conclusion with details from the testimony and documents presented. In exhibit 10, the Board observed that "[i]n a moment of particular candor, Mr. Kackman acknowledges that . . . there was a suspicion of the presence of lead-based paint." AR at 73. Indeed, in that exhibit, an e-mail to Vroom from Kackman, Kackman expressed his desire for a copy of a hazardous material survey *before* they began work. Kackman noted that "[i]f [information about lead in the paint] does not exist, or denotes the presence of lead paint we will proceed according to the applicable regulations." Ex. 10, at 2. Kackman ended the e-mail by informing Vroom that he would have Malone take a sample of the paint for testing in the event the hazardous material survey was silent on the issue of lead. Malone collected the sample as requested on October 12, 2004, and delivered it to Kackman. Kackman let the sample sit on his desk for several days even while Malone called daily to remind Kackman that the sample needed to be analyzed.

¶26 The Board was further disturbed by Kackman's understanding of Elder's written lead policy.[4] The Board recognized that though the policy was not carefully worded, it was clear that "the only logical interpretation was to prohibit the torch burning of paint until it is determined

---

[4] Elder had a written policy prepared before this incident describing the necessary precautions and actions each person (foreman, project manager, etc.) should take for dealing with lead.

that lead is not present." AR at 74 (emphasis omitted). It is hard to credit Kackman's testimony that it was his understanding that "he thought torch burning paint [was] permitted until it was determined lead [was] present." AR at 74 (emphasis omitted).

¶27 It is clear from the testimony that Kackman did not ask specifically about the presence of lead paint, did not stop torch cutting once Malone brought up his suspicions about the lead, and allowed a paint sample to sit on his desk for several days while his workers were needlessly exposed to the lead dust. Kackman's understanding of regulations and Elder lead policy may not have been perfect, but it is also clear from his testimony that his behavior would not have changed even if he had that perfect knowledge.[5] He had a suspicion about the presence of lead paint and did nothing to mitigate that suspicion, to the detriment of those working at the site. Substantial evidence supports the Board's conclusion that Elder Demolition acted, through its project manager, with an intentional disregard of or plain indifference to WISHA requirements.

¶28 We affirm the Board's decision.

ARMSTRONG and QUINN-BRINTNALL, JJ., concur.

---

[5] We are not unmindful that lead based paint hazards are well documented and are the subject of significant legislation such as the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629, and the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. §§ 4851-4856.