IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| NORTH COAST IRON CORP., ) | No. 76847-6-I |
| Appellant, ) | DIVISION ONE |
| v. ) | |
| DEPARTMENT OF LABOR AND ) INDUSTRIES, ) | |
| Respondent. ) | UNPUBLISHED OPINION |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | FILED: August 6, 2018 |

ANDRUS, J. — A North Coast Iron (NCI) worker fell to his death while installing a steel beam on the upper floors of a 10 story building. After an investigation, the Department of Labor & Industries (Department) found that NCI had failed to provide adequate safety equipment and training, conduct safety inspections, or maintain workplace safety training documentation. The Department cited NCI for multiple safety violations, some deemed serious and some willful. The Board of Industrial Appeals (Board) affirmed, as did King County Superior Court. Because the record supports the Board's findings, we affirm.

## FACTS

A general contractor (GC) hired NCI to install steel beams on a 10 story building on Taylor Avenue in Seattle. The GC leased a hydraulic scaffold system, known as the Fraco scaffold, from Sun Scaffolding, which the GC made available for use by its subcontractors, including NCI, and their employees.

On January 6, 2014, NCI began to install a steel "eyebrow," a 197-foot long, four-inch beam near the building's roof. One NCI employee, Jay Ayers, stood on the roof guiding the crane operator's placement of the large steel beam. Two NCI ironworkers, Aaron Adair and William Lemieux, waited on the Fraco scaffold for the crane to lower the first half of the beam in place; Lemieux helped Adair level it and Adair welded it to the building.

Ayers, Adair, and Lemieux knew they needed fall protection gear while standing on the scaffold during the eyebrow installation. The work platform of the Fraco scaffold moved up and down hydraulically; Kyle Grayson, the Department's safety and health officer, testified that it had been configured to clear window "bump outs" on lower levels. When the workers moved the scaffold platform above these bump outs, an unprotected 55-inch wide gap existed between the scaffold platform and the building face.

So before starting work, Lemieux and Adair donned full-body harnesses. They borrowed vertical lifelines from the GC and anchored these ropes to the building roof. Adair clipped his harness to his lifeline with a lanyard. After welding the first half of the beam, Adair and Lemieux tried to walk to the other end of the wall to receive and then weld the second beam section. Adair's lifeline did not reach. There was conflicting evidence as to what happened next. Lemieux testified that Adair unclipped his harness from the lifeline and clipped it to an anchor point on the scaffolding itself. Ayers testified, however, that he saw Adair unclip and fall before he could tie off to another anchor point. Another witness, William Harvey, testified that he saw Adair trip over a welding line and fall off the scaffold platform. What is uncontested is that Adair fell 72 feet to his death.

The Department found several safety violations, including that: (1) NCI failed to ensure that its workers used appropriate fall protection equipment; (2) Ayers stepped

outside the roof guardrail without tying off; (3) NCI did not protect the vertical lifelines from the abrasive nature of the roof's concrete edge; (4) NCI failed to provide its employees with training on how to operate and work from the Fraco scaffold; and (5) NCI failed to provide and document safety training and inspections. The Department cited NCI for eight separate safety violations and assessed penalties. The Department placed NCI on its "Severe Violator Enforcement Program," under which the company was subject to follow-up inspections.

NCI appealed the Department's findings to the Board. The Board affirmed each of the Department's findings and imposed substantial fines.

## ANALYSIS

Washington's Industrial Safety and Health Act (WISHA), chapter 49.17 RCW, serves to assure safe and healthy conditions in the workplace. RCW 49.17.010. WISHA authorizes the Department to promulgate regulations governing workplace safety. RCW 49.17.050. The Department may issue citations and impose penalties when employers violate these regulations. RCW 49.17.120, .180.

In a WISHA appeal, this court reviews the Board's decision directly, based on the record before the agency. J.E. Dunn Nw,. Inc., v. Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007). The Board's findings are conclusive if they are supported by substantial evidence in light of the record as a whole. Id. at 43. Substantial evidence is evidence sufficient "to persuade a fair-minded person." Id. at 42. This court reviews the Board's conclusions of law to determine whether they are supported by its findings of fact. Id. The reviewing court does not reweigh the evidence. Davis v. Dep't of Labor & Indus., 94 Wn.2d 119, 124, 615 P.2d 1279 (1980).

The Board's findings of noncompliance are supported by substantial evidence.

NCI challenges the Board's findings and conclusions as to safety violations identified by the Department as Items 1-1, 1-3, 2-1a, 2-1b, and 2-3.[1]

Item 1-1

When employees work from a scaffold more than 14 inches from the work face, employers must provide a guardrail or ensure that workers use a personal fall arrest system. WAC 296-874-20054. A fall arrest system is defined as "a fall protection system that will arrest a fall from elevation." WAC 296-155-24603. A personal fall arrest system must include a full body harness, an anchor point, and connectors. Id. It may include a lanyard, a deceleration device, a lifeline, or a "suitable combination" of these components. Id. A "deceleration device" is "any mechanism, such as a rope grab[2] . . . [or] automatic self-retracting lifelines/lanyards, etc., which serves to dissipate a substantial amount of energy during a fall arrest." Id. Under WAC 296-155-24615, rope grabs are prohibited "unless they are part of a fall restraint system designed specifically for that purpose by the manufacturer, and used in strict accordance with the manufacturer's recommendations and instructions." See also WAC 296-155-24603 ("The use of a rope grab device is restricted for all restraint applications").

The Board found that NCI did not supply a complete fall protection system to its workers—the employees had to borrow the GC's lifelines, at least one of which lacked

_____

[1] Although NCI assigns error to the Board's findings and conclusions concerning Items 1-2, 2-2, and 3-1, it makes no argument as to the Board's findings of noncompliance with these Items. We decline to consider assignments of error not supported by argument. Cowiche Canyon v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); see also RAP 10.3(a)(6).

[2] A rope grab is a fall arrester that is designed to move up or down a lifeline suspended from a fixed overhead or horizontal anchorage point, or lifeline, to which the full body harness is attached. WAC 296-155-24603. In the event of a fall, the rope grab locks onto the lifeline rope through compression to arrest the fall. Id. The Board found that two of the three lifelines had rope grabs. This finding appears to be an error. Ayers, Lemieux, and Grayson stated that two of the three lifelines lacked rope grabs.

approved rope grabs. NCI contends the Board erred in finding that Adair's lifeline was incomplete because the overhand loop knot the workers put in the GC's lifeline was an adequate substitute for a rope grab. The Board correctly rejected this argument and we do so as well.

NCI's workers knew they needed to wear fall protection gear and discussed the type of system they should use during the eyebrow installation. They discussed the possibility of using NCI-provided retractable lines, called "yo-yos," but decided this option was impractical because they lacked an adequate overhead anchorage point.[3] And they could not figure out how to safely move from the inside to the outside of the building wearing retractable lines. Lemieux also testified that they did not have enough yo-yos for two people to be on the outside of the building at the same time. Lemieux suggested they borrow vertical lifelines from the GC and anchor the lines to the roof. Neither Lemieux nor Ayers had ever used vertical lifelines before but Lemieux had seen other subs using this system at this site and felt it would work for them as well. When they retrieved the lifelines, they discovered that two of the three lines lacked rope grabs. Lemieux testified he tied a half-inch overhand loop knot in the lifeline as a sort of jerry-rigged rope grab system.

Department Inspector Grayson confirmed that on the day of the accident, two of the vertical lifelines lacked manufacturer-approved rope grabs. David Conley, the Department's internal technical construction safety expert, and Bradley Dillon, the vice president of product and business development at Guardian Fall Protection, the

---

[3] A "yo-yo" is a self-retracting lifeline, defined in WAC 296-155-24603 as "a deceleration device which contains a wound line which may be slowly extracted from, or retracted onto, the device under slight tension during normal employee movement, and which after onset of a fall, automatically locks the drum and arrests the fall."

manufacturer of the vertical lifeline that Adair used, testified that the overhand knots were not designed by the manufacturer and thus, not approved rope grabs. In response, NCI's construction safety expert, Kurt Stranne, testified that under Occupational Safety and Health Administration (OSHA) letters of interpretation, "prusik" knots[4] are acceptable alternatives to rope grabs because this type of knot allows the worker to move the knot up and down the line without affecting the weight bearing capacity of the lifeline itself. But Stranne acknowledged that the knot tied by Lemieux was not a prusik knot. NCI did not present any evidence that the overhand knot the workers used on January 6, 2014 met WISHA safety standards.

NCI also contends it met the requirements of WAC 296-874-20054 by simply providing yo-yos for its ironworkers' use. NCI's owner, Kent Schluter, testified that there were yo-yos in Adair's work truck on site that day. Adair, however, was not on site every day and in fact, had left the Taylor project for several weeks, leaving Lemieux and Ayers without access to the yo-yos. Moreover, it does workers no good to be provided fall protection gear they cannot use or to be provided an insufficient number of yo-yos for the number of workers on the job site. NCI points to no evidence rebutting the testimony that yo-yos were not an appropriate option for the eyebrow installation or demonstrating that it had in fact provided a sufficient number of yo-yos for both Adair and Lemieux. The Board had ample evidence before it to find that NCI did not ensure that Adair and Lemieux had a complete fall arrest system to use while on the scaffold in violation of WAC 296-874-20054.

---

[4] A "prusik knot" is "a knot used in mountaineering for tying a small sling to a climbing rope as an aid to one who has failed into a crevasse and that holds fast when weighted but is movable when unweighted." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1829 (2002).

NCI next contends the Board erred in finding that Adair fell because he disconnected his fall protection equipment from the lifeline. But there was conflicting evidence on this factual issue. Ayers testified that he saw Adair unclip from the lifeline and clip back to the scaffold before falling. Yet, he admitted he had earlier stated to Department investigators that he saw Adair unclip right before he fell. Stranne opined that the fall arrest indicator on Adair's harness had been triggered, making it likely that Adair fell because an anchor point to which he was connected failed. But another expert witness, Craig Firl, a representative of Capital Safety, the manufacturer of Adair's harness, inspected the harness and disagreed with Stranne. He opined that the condition of the harness after the fall made it unlikely that it had been involved in any fall-arrest event. The record also includes evidence that Adair was unclipped earlier that day and had received warnings about working without being properly tied off on several previous occasions. Substantial evidence supports the Board's finding that Adair fell because he disconnected his harness from any anchor point. We affirm the Board's findings and conclusions as to Item 1-1.

Item 1-3

Employers must ensure that each employee who works on a scaffold is trained by a qualified person. WAC 296-874-20072. Training must include identification of fall hazards and appropriate methods of fall protection. Id. The Board found that NCI did not ensure that its workers received training for the Fraco scaffold. NCI contends the GC trained the NCI workers in using the Fraco and the Board erred in finding otherwise. Again, we find sufficient evidence in the record to sustain the Board's finding.

A Sun Scaffold representative, Loren Dennis, testified that only Sun Scaffold employees are qualified to train workers in using the Fraco. The manufacturer's training

included a 30 to 45 minute classroom training to learn about hazards, obstacles on the building, powerlines, tie off points, and the existence of open exposures. This training also included an in-field demonstration on how to operate the scaffold. Once a worker received this training, they received a sticker to put on their hard hat. Ayers and Lemieux testified they did not receive any Fraco training. Brandon Elley, the GC project manager, testified that he provided some training to NCI employees. Ayers admitted that he talked with Elley about how to operate the scaffold but testified that no one went over hazards associated with the scaffold or how to work off of the scaffold when so high up in the air. Dennis testified that Elley was not an employee of Sun Scaffold and not allowed to train workers on how to work safely while using the Fraco scaffold. Substantial evidence supports the Board's finding that NCI did not ensure its workers were properly trained on the operation of the Fraco scaffold in violation of WAC 296-874-20072.

Item 2-1a

Employers must assure that an appropriate fall protection system is provided and implemented when employees are working four feet or more off the ground. WAC 296-155-24609(1). Based on a finding that Ayers did not use fall protection at all times, the Board concluded that NCI violated this regulation. At the hearing, Ayers initially testified that while on the roof, he stepped outside the guardrail to hand something down to Adair or Lemieux and was tied off to a lifeline when he did so. The Department introduced Ayer's prior statement to its inspectors in which he stated that he had briefly stepped outside the guardrail to hand a level to Adair without tying off. NCI did not object to the admissibility of this prior inconsistent statement. When confronted with this inconsistent statement, Ayers testified he could not recall the incident. The Board was free to accept as true Ayers' prior inconsistent statement to the Department. This court does not

reweigh the evidence or the credibility of witnesses. Davis, 94 Wn.2d at 124. Substantial evidence supports the Board's finding that NCI violated WAC 296-155-24609(1).

Item 2-1b

Employers must develop and implement a written fall protection work plan for each area of the workplace where fall hazards of at least 10 feet exist. WAC 296-155-24611(2). This work plan must (i) identify all fall hazards in the work area; (ii) describe the method of fall arrest or fall restraint to be provided; (iii) describe the proper procedures for the assembly, maintenance, inspection and disassembly of the fall protection system to be used; (iv) describe the proper procedures for the handing, storage, and securing of tools and materials; (v) describe the method of providing overhead protection for workers who may be in, or pass through the area below the worksite; (vi) describe the method for prompt, safe removal of injured workers; and (vii) be available on the job site for inspection by the department. Id. The Board found that NCI did not develop or implement such a plan for the eyebrow installation. NCI contends it did not violate WAC 296-155-24611(2) because the GC had performed a job hazard analysis for the eyebrow installation and NCI was entitled to rely on the GC's analysis.

James Wilkins, the GC's project superintendent, testified that he did "go through" a job hazard analysis for the eyebrow installation orally with Ayers and Lemieux in a 30 to 45 minute meeting the Friday before the work was to start. He stressed to the ironworkers the need for fall protection and the requirement that the workers be tied off 100 percent of the time. Neither Wilkins nor NCI produced a written fall protection work plan for this project. And Ayers testified that when he met with Wilkins, they discussed the need to be tied off but did not discuss specific fall hazards or specific fall protection that would be needed. Ayers and Lemieux testified that, on the morning of the installation,

they did not have a plan for fall protection at all. They discussed various options and eventually borrowed lifelines from the GC because they could not figure out how to make any other system work given the position of the scaffold and where they needed to stand to weld the beams in place. Based on this record, the Board could reasonably find that the GC's "job hazard analysis" was not in fact a written fall protection work plan as required by the regulations and that NCI did not ensure that such a written plan was prepared and maintained on the job site. Substantial evidence supports the Board's finding that NCI violated WAC 296-155-24611(2).

<u>Item 2-3</u>

The Board found that NCI failed to ensure that the vertical lifelines were protected from sharp edges and abrasion, as required by WAC 296-874-20060(1)(c). NCI contends the Department failed to prove that the roof's edge was sharp or had damaged the lifelines. The regulation, however, prohibits direct contact of the lifeline to any abrasive surface, whether damage to the lifeline is evident or not.

In disputing the Board's finding, NCI relies on the testimony of its expert, Kurt Stranne, who testified that the roof's chamfered[5] edge was not "sharp" within industry standards. Department Inspector Grayson, however, testified that concrete causes abrasion of lifelines even when the edge is chamfered. The Board found that the concrete rim "was composed of abrasive material, as was evidence form photographs of the roofs' edge." Grayson identified exhibit 7 as a photograph depicting this condition. He testified that the concrete surface required the use of a "softener," basically an outer cover on the line to protect it from abrasion. He also identified visible abrasion damage on one of the

---

[5] To "chamfer" an edge means to bevel it. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 372 (2002).

lifelines. James Carpenetti, NCI's superintendent, testified that he, too, believed that the lifelines should have been protected where draped over the roof's edge. NCI did not present any evidence to substantiate the position that the roof's concrete edge was not abrasive. The record supports the Board's finding that NCI violated WAC 296-874-20060.

We conclude that Board's findings of fact of noncompliance are supported by substantial evidence.

<u>The Board did not err in finding that the violations were "serious" and "willful."</u>

Under WISHA, violations fall into three categories: willful or repeat, serious, and not serious. RCW 49.17.180(1), .180(2), .180(3). To sustain a violation's classification as willful or serious, the Department must show aggravating factors in addition to noncompliance. RCW 49.17.180(1), .180(2), .180(6). Where the Department fails to prove that a violation was willful, the violation may be sustained as serious. <u>See, e.g.</u>, <u>In re: Serv. Elec. Co. Inc.</u>, No. 14 W0018, 2016 WL 4421992, at *4 (Wash. Bd. Ind. Ins. Appeals July 14, 2016).

In this case, the Board concluded that Items 1-1, 1-2 and 1-3 were willful and Items 2-1a, 2-1b, 2-2, and 2-3 were serious violations. NCI challenges each of these conclusions. The Department's position is that the record establishes that all of these violations were serious and Items 1-1, 1-2, and 1-3 were also willful.

A. The Board's seriousness findings

NCI challenges the Board's findings that the violations documented in Items 1-1 and 1-3 were serious, asserting that it did not have actual or constructive knowledge of these violations. To establish that a violation is "serious," the Department must show that the employer knew or should have known of the noncomplying condition. <u>J.E. Dunn</u>, 139 Wn. App. at 44-45. Constructive knowledge is imputed where, in the exercise of

- 11 -

reasonable diligence, an employer could have known of the violation. RCW 49.17.180(6). Reasonable diligence includes the employer's obligation to inspect the work area, anticipate hazards, and take measures to prevent harm. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011). The Department may show constructive knowledge through evidence that the violating condition was readily observable. Id. at 207. A record of similar violations is also relevant. Id.

NCI did not document the fall protection training it provided to any of its employees. NCI did not train Adair or Lemieux on how to work safely on the Fraco scaffold or how to properly use a vertical lifeline and rope grab. NCI did not ensure that a competent person inspected the Fraco scaffold on the day of the accident. NCI did not conduct a safety inspection before starting the eyebrow installation. There is ample evidence that the hazards of working on a scaffold high above ground were readily observable to NCI and that had NCI exercised reasonable diligence, it would have known that its workers needed different fall protection equipment than Adair had in his truck and needed training specific to working 72 feet in the air on the Fraco scaffold. In addition, Lemieux repeatedly asked for scaffold training, indicating that NCI had actual knowledge that training was needed. Substantial evidence supports the Board's findings that NCI knew or should have known of Items 1-1 and 1-3.

B. The Board's willfulness findings

NCI also contends the Board erred in finding that the violations set out in Items 1-1, 1-2, and 1-3 were willful. To prove that a violation was willful, the Department must show that the employer demonstrated "intentional disregard of or plain indifference to the requirements of the statute." Elder Demolition, Inc. v. Dep't of Labor & Indus., 149 Wn. App. 799, 807, 207 P.3d 453 (2009) (project manager exhibited indifference to safety

regulations by failing to test suspected paint for lead content before workers started torch burning of paint, despite knowing hazards of lead-based paint).

The Department alleged three willful violations: failing to provide adequate fall protection for employees working on the Fraco; failing to ensure that fall-protection training was conducted and documented; and failing to ensure that employees received scaffold training. The Board found that NCI knew its employees were working on a scaffold high above the ground, yet took no steps to ensure they had appropriate fall protection gear for this site. The Board also found that NCI knew Fraco training was required because the requirement was generally known to all subs on the project site and Lemieux repeatedly asked for this training. And, because NCI did not document what training its workers had received, the Board found that the company could not know when employees required additional training. As a case in point, the Board stated that neither Adair nor Lemieux had been trained in using vertical lifelines or a Fraco scaffold. This failure to act was, in the Board's view, plain indifference to the regulations addressing fall protection, fall-protection training, and scaffold training.

The evidence supports the Board's finding of willfulness. Kent Schluter, NCI's president, testified that the two employees with direct authority over the ironworkers were Schluter and the company's superintendent, James Carpenetti. Yet, neither could provide much detail regarding how they ensured site safety on this project. Despite the fact that Schluter had decades of experience in construction and was generally aware of fall protection requirements, he relied completely on the GC to provide oversight of NCI employees' work while they were on the Taylor project. But Brandon Elley, the GC's safety officer and project engineer, testified that NCI was supposed to do its own weekly safety site inspection. The GC expected its subcontractors to be responsible for the

supervision and safety of its own employees and to ensure that their employees were trained in the tasks they needed to do.

It was not clear who within NCI was actually in charge on this project on a day to day basis. Although Schluter insisted Adair was the company's designated foreman, Adair was absent from that job site for several weeks before the accident. Brian Schluter, an NCI vice president, thought Ayers became the acting foreman when Adair was off site. Yet, Schluter testified that Ayers was never designated as an NCI foreman at Taylor before Adair's death. Ayers testified that when Adair was pulled from the site, he was told there was no actual NCI foreman there.

There is evidence to support the finding that NCI management was paying very little, if any, attention to its compliance with WISHA regulations. Schluter knew, for example, that NCI was not holding weekly safety meetings on site, or conducting periodic inspections of the job site to ensure its employees were following safety rules. Carpenetti had no idea what safety inspections NCI was conducting. He did not conduct any such inspections himself. Schluter testified that to his knowledge, NCI never provided fall protection training to its employees specific to the use of ropes and vertical lifelines. Likewise, Schluter was aware of the eyebrow installation and send Adair to help with the job. But despite this knowledge, Schluter took no steps to ensure that a fall protection plan was in place, leaving his workers to borrow incomplete equipment for which they did not have adequate training. Carpenetti knew NCI's workers were using the Fraco scaffold at the Taylor site because he saw Lemieux on the scaffold on one of its visits to the site.

Yet, no one in NCI management took any steps to verify that its employees had been trained on that equipment or could even describe what training was provided by the GC.[6]

Schluter admitted NCI did not prepare a fall protection work plan for the Taylor project; the company provided a blank template to the GC and assumed the GC would fill it out. Yet, James Wilkins, the GC's site superintendent, testified that all subcontractors were required to provide their own fall protection work plans. He also testified that each subcontractor was responsible for the safety of its own employees.

This testimony is consistent with state law. Under RCW 49.17.060, each employer must furnish its employees with a place of employment free from recognized hazards likely to cause serious injury or death. RCW 49.17.060 imposes a two-fold duty on employers. State v. P.B.M.C., Inc., 114 Wn.2d 454, 457, 788 P.2d 545 (1990). There is a general duty to protect one's own employees from recognized hazards and there is a specific duty to comply with WISHA regulations. Id. This statute does not allow an employer to pass off its site safety duties to others. Assuming some other company is going to fulfill your duty to prepare a written site specific fall protection plan or to provide appropriate fall protection gear, without following up to ensure that it was in fact done, constitutes plain indifference to the WISHA regulations.

The Board did not err in finding that NCI's violations were willful.

---

[6] NCI asserts that only Schluter's actions, knowledge, and state of mind are relevant to whether the company acted willfully. The argument is without merit. A corporation acts through its agents. Houser v. City of Redmond, 91 Wn.2d 36, 40, 586 P.2d 482 (1978). When agents act within the scope of their employment, their actions are the actions of the corporation. Id. Thus, when a foreman or supervisor has actual or constructive knowledge of a safety violation, such knowledge can be imputed to the employer. Potelco, Inc., v. Dep't of Labor & Indus., 194 Wn. App. 428, 440, 377 P.3d 251 (2016).

## The Board did not abuse its discretion in admitting Ayers' statement to the Department's inspectors.

NCI argues that the Board erred in considering Ayers' statement that he stepped outside the roof's guardrail without fall protection.[7] NCI asserts that the Industrial Appeals Judge (IAJ) admitted Ayer's statement on the erroneous theory that Ayers was an NCI foreman and thus, a speaking agent of the company. We review the evidentiary rulings for an administrative hearing officer's abuse of discretion. Univ. of Wash. Med. Ctr. v. Dep't of Health, 164 Wn.2d 95, 104, 187 P.3d 243 (2008). Discretion is abused only where no reasonable person would take the view adopted by the hearing tribunal. Brundridge v. Flour Fed. Servs., Inc., 164 Wn.2d 432, 450, 191 P.3d 879 (2008).

We reject NCI's evidentiary argument because the Department read Ayers' statement to the Department's inspectors into the record as a prior inconsistent statement of a witness, not as the statement of a party opponent. A prior inconsistent statement is not hearsay under ER 801(d)(1). Moreover, NCI stated on the record that it had no objection to the admissibility of this evidence. We find no abuse of discretion in the IAJ's evidentiary ruling and that the company waived any objection it had when the statement was offered by the Department.

## This Court will not review the Department's decision that NCI should be subject to inspections under the Severe Violator Enforcement Program.

Finally, NCI challenges its placement in the Department's Severe Violator Enforcement Program (SVEP). NCI argues that the program is not expressly authorized by statute and thus, exceeds the scope of the Department's authority. The Department asserts that the propriety of the SVEP is not properly before this court because NCI failed

---

[7] NCI also challenges, without argument, all other adverse evidentiary rulings. Again, we decline to consider these assignments of error as they were not addressed by argument in the opening brief. Cowiche Canyon, 118 Wn.2d at 809.

to raise the challenge below. RCW 49.17.150(1). And the Department argues that the SVEP is within its statutory inspection authority.

We decline to review the Department's SVEP decision. NCI raised its placement on the SVEP list in its notice of appeal of the citation to the IAJ. But it appears that NCI made no argument and presented no evidence on the issue at the evidentiary hearing. And we find no reference to the SVEP designation in NCI's petition for review to the Board. NCI objected to its inclusion in the program in an oral argument opposing a Department motion to continue discovery deadlines. The IAJ ruled that NCI had not properly raised the issue in that oral hearing and instructed NCI to file a motion if it wished to have the IAJ rule on the Department's authority to place NCI on the SVEP list. NCI points to no evidence that it filed such a motion or raised this issue with the Board. WISHA requires parties to raise issues to the Board before seeking judicial review of a Department action. RCW 49.17.150. We conclude that NCI failed to properly raise the issue below and may not raise it for the first time on appeal. RAP 2.5(a).

We affirm.

WE CONCUR:

_Andrus, J._